[Crim. No. 387. Third Appellate District.—September 11, 1917.]

## THE PEOPLE, Respondent, v. H. STANLEY CRANE, Appellant.

CRIMINAL LAW—EMBEZZLEMENT—SUFFICIENCY OF EVIDENCE—APPEAL.—In a prosecution for the crime of embezzlement, where the evidence is such as to amply support the verdict, the verdict will not be disturbed on appeal, although the evidence is such that it might properly be held sufficient to sustain a verdict of larceny.

ID.—MISAPPROPRIATION OF FUNDS OF WARDS—TIME OF FORMING INTENT—EVIDENCE.—In a prosecution for embezzlement, the defendant was properly found guilty of embezzlement instead of larceny, where it was shown that he, while acting as a guardian of certain minors, induced their mother to become their guardian upon the representation that he could loan the money of the wards at a higher rate of interest if someone else was appointed, and that she upon her appointment redelivered the money to him, and that he deposited it in a bank in his wife's name, and subsequently drew checks thereon reducing the deposit to a small amount, since the jury was justified in concluding that the intent to appropriate the money was not formed until after it was received.

ID.—EMBEZZLEMENT OF MONEY—RECEIPT OF BANK DRAFT—EVIDENCE—LACK OF VARIANCE.—In such a prosecution, evidence that the defendant received a draft from a guardian for the purpose of loaning the proceeds of the draft, that he deposited it in an account in his wife's name on which both he and his wife were authorized to draw checks, and that checks were drawn against the account, warranted a conviction for the embezzlement of the money, as charged, instead of the draft.

ID.—VENUE OF CRIME—SUFFICIENCY OF EVIDENCE.—In such a prosecution the jury was justified in finding that the embezzlement of the money was committed in the county where the draft was deposited, notwithstanding it was delivered to defendant in another county.

ID.—DEMAND AND REFUSAL—EVIDENTIARY MATTER.—A demand for the return of property or money intrusted to a bailee or trustee, followed by a refusal to return the property or money, is not of itself an element of the crime of embezzlement but is merely evidence thereof, and where there is other proof of the felonious conversion of the money or property, a demand and refusal are not essential elements of the crime.

ID.—PROOF OF TIME OF COMMISSION OF OFFENSE.—In a prosecution for embezzlement, it is sufficient to show that the crime was committed within the statutory period within which an indictment or information for such offense may be found or filed, without proving the precise time at which the crime was committed.

APPEAL from a judgment of the Superior Court of San Joaquin County, and from an order denying a new trial. John Hancock, Judge Presiding.

The facts are stated in the opinion of the court.

Walter F. Lynch, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—Appellant was convicted, in the superior court of San Joaquin County, of the crime of embezzlement and was sentenced to ten years' imprisonment in the state prison. He appeals from the judgment and from an order denying his motion for a new trial.

The information charged that, on or about the seventeenth day of November, 1917, defendant, as the agent, servant, and employee of one Harold King, embezzled the amount of $569.50, the property of said Harold King.

On May 4, 1914, one John King died in San Joaquin County, leaving an estate therein and leaving surviving him a widow, Matilda King, and six children, three by his said widow and three by a former wife, the sister of said Matilda. Of these children, four were minors, their names being, respectively, Harold W., a son by the first wife, and Edna V., Edward L., and Enid King, issue of the second marriage.

On June 1, 1914, defendant was appointed administrator of the estate of John King, deceased, and, on February 24, 1915, he was appointed guardian of said minor children. He filed an account of his guardianship on October 23, 1915,

which showed a balance in his hands, to the credit of said minors, of $1,494.97. Said account was settled on November 15, 1915, and the resignation of the defendant as guardian was accepted. On the following day Matilda King was appointed guardian of said minors and, on November 17, receipted to appellant for said sum of $1,494.97.

On September 10, 1915, defendant wrote a letter to Miss Ethel L. King, a daughter of John King, by his first marriage, who was a school-teacher at Los Banos, stating that he would call upon her shortly and talk over the guardianship matter with her. Pursuant to said letter he called upon said Ethel in the latter part of September. She testified that the following conversation occurred between them: Defendant told her that he had seen her aunt [who was also her stepmother], Matilda King, at Salinas, where she was residing. "Mr. Crane wanted to lend the money out at eight per cent, and I told him I didn't want it loaned out at eight per cent, you couldn't get good security at eight per cent; and he said he knew a place where he could get good security, and I still objected, and he said that, well, to make it doubly secure, he knew that the security he could get was good enough, but, to make it doubly secure, he would give his note too. And he led me to believe that he was still acting as the guardian of the estate, although it was going to be transferred over to my aunt; and I asked him why he couldn't do that without transferring the guardianship over to my aunt, and he said that he could not do it—he could do it as my aunt's attorney, but he could not do it while he was guardian of the estate. . . . He told me to write and advise my aunt to become the guardian of the estate so that he could act as her attorney and lend this money out to someone else. I wrote her and told her that Mr. Crane had done our business before, and that it was all right to let him go on and tend to the business the way he wanted to, as he was guardian—he told me he was guardian now, and he ought to be able to look after the interests of the children as he thought best, while he was guardian, and if we didn't do it the way he wanted to he would turn the money over to the courts, and they would get practically all of it, . . . the lawyers would get it all. Q. Did Mr. Crane at any time say anything at all about him borrowing the money himself? A. No, he did not. He was always going to borrow it for

someone else. He was merely going to give his note as double security.''

On September 27, 1915, defendant wrote Mrs. Matilda King, at Salinas, stating that he had called on Ethel King and had suggested ''by reason of the fact that you could put out the money belonging to the four minor children at eight per cent interest, that it would be better to have you appointed guardian at Salinas and then I could attend to all the other matters for you thereafter. I told Miss Ethel that I would have you appointed guardian without any expense to you in the matter. After going over the matter fully with Miss Ethel, she agreed with me that it would be to the advantage of the four minors to have you appointed guardian and she said that she would write you on Tuesday and advise you to act in this matter according to my advice.'' He suggested that he would go to Salinas the following week with the necessary papers.

Other letters from defendant to Ethel King were introduced in evidence, in one of which appears the sentence: ''I received a card from Mrs. King a few days ago saying that she would write me as soon as she had heard from you and had received your advice,'' and, on November 4, 1915, he wrote that he was going to Salinas ''next Tuesday, at which time I will have Mrs. King appointed guardian.''

Mrs. Matilda King testified that defendant called upon her in Salinas twice, once in the latter part of September and again on November 10, 1915. As to the conversation occurring at the first visit, Mrs. King testified: ''He told me that he wanted to appoint me guardian over the children, and I asked him why, and he said that to loan out the money, as him being a lawyer he couldn't loan it out; I asked him why that was; because, he said, he was a lawyer, because he was the guardian over them, that he could not loan it out. . . . He said he could loan it out for eight per cent, while the bank was only paying four. . . . He said it was lying idle in the bank, wasn't bringing any interest in at all. . . . I thought it was a good idea, because it would be earning more for the children, as he said he could loan it out at eight per cent.''

As to what transpired on November 10th, Mrs. King said that she gave defendant six hundred dollars of her own money to be by him loaned at eight per cent. Defendant

handed Mrs. King a draft, dated November 9, 1915, for
$1,494.97, the amount shown to be due from him to the
minors. This draft was drawn by the San Joaquin Valley
Bank, of Stockton, on the Wells-Fargo Nevada National
Bank, of San Francisco. Mrs. King indorsed it and imme-
diately returned it to the defendant, whose indorsement also
appears upon it under that of Mrs. King. The testimony of
the cashier of the Commercial and Savings Bank of Stockton
was that the draft was deposited in that bank on November
16th, to the credit of the account of the wife of defendant,
but that the account was so arranged that either the defend-
ant or his wife could check against it. The cashier further
testified that immediately before and at the time the deposit
was made as indicated there was an overdraft in the ac-
count of the Cranes of $451.77; that said overdraft was
credited from the draft deposited by Crane, leaving in the
account the sum of $1,043; that this amount, through check-
ing against it, was, on the following day—November 16,
1915—reduced to the sum of $820; that, from time to time
thereafter until the eighteenth day of December, 1915, the
account, with small deposits added thereto at different times,
was so drawn upon that, on the date last mentioned, there
remained in the account the sum of $38.74 only. A perfora-
tion in the draft shows that it was paid on March 18th.
Mrs. King testified that defendant delivered to her four
promissory notes, each signed by him, dated November 17,
1915, and made payable to the order of Matilda King, with
interest at eight per cent per annum. The first of said
promissory notes was for the sum of $569.50 (the amount
charged in the information to have been embezzled from
Harold King) and was payable on April 2, 1919. Each of
the remaining notes was for the sum of $344.50, being pay-
able, respectively, in 1921, 1926, and 1929. Mrs. King tes-
tified that Harold would become of age on April 2, 1919, the
date of the maturity of the first note, and that the other
three minors would become of age, respectively, at the dates
when the remaining notes would mature. Asked concerning
the conversation between herself and defendant on his second
visit to her, Mrs. King said: "He was going to loan the
money out at eight per cent for the children, and he asked
me if I had any to loan out. Q. How did he come to give
the notes, how did that happen? A. He said he would give

me his personal notes for the money. Q. Now, did he say
he was borrowing this himself, or going to take it from you
to loan to somebody else? A. He said he was going to loan
it out; he didn't say he was borrowing it for himself; that
he would loan it out at eight per cent."

There is some conflict in the record regarding the precise
time at which the second conversation above referred to and
the delivery of said instruments occurred. While Mrs. King
testified that the date was November 10th, her receipt to de-
fendant is dated November 17th, and the notary public,
before whom she acknowledged her signature thereto and
before whom she took the oath of office as guardian, testified
that November 17th was the date upon which he took her
acknowledgments, though the oath of office contained the
certificate that it was "Subscribed and sworn to before me,
this sixteenth day of November, 1915." The notary also
said that Mr. Crane was present with Mrs. King on November
17th, when she acknowledged said instruments. Mrs. King
stated that she noticed the notes were "dated ahead." The
testimony of the defendant, given upon the examination of
the case before a magistrate, was that he delivered the draft
and the promissory notes to Mrs. King on November 17th
and that the conversation testified to by her was held on the
same day. As seen, the draft was deposited in the bank at
Stockton on November 16th. However, as no point is made
as to any discrepancy in the dates, we will make no attempt
to reconcile them.

A reversal is urged on these several grounds: 1. That the
evidence shows that the crime, if any at all was committed,
is larceny and not embezzlement; 2. That there was and is
a variance between the allegations of the information and the
proof, in that, if the crime of which the defendant was con-
victed was committed at all, the evidence discloses that it was
the embezzlement of a draft and not of money, as charged;
3. That the crime charged, if committed, was committed in
Monterey and not in San Joaquin County, hence the court
below was without jurisdiction to try the accused; 4. That
the crime of embezzlement is not consummated until a de-
mand for a return of the property or money is made upon
the bailee or trustee, and that the evidence fails to show that
any such demand was made; 5. That the evidence shows that,
the defendant having given Mrs. King his promissory notes

for the money, the relation of debtor and creditor was thus created between the parties as to said money, and that therefore there can be no embezzlement by the mere failure or refusal by the defendant to pay said notes or repay said money; 6. That the failure to prove the precise time at which the alleged embezzlement occurred is fatal to the verdict and judgment.

The information is based on section 506 of the Penal Code, which is as follows: "Every trustee, banker, merchant, broker, attorney, agent, assignee in trust, executor, administrator, or collector, or person otherwise intrusted with or having in his control property for the use of any other person, who fraudulently appropriates it to any use or purpose not in the due and lawful execution of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, . . . is guilty of embezzlement."

1. As to the first of the above-enumerated propositions for which a reversal is urged, the theory of the defendant is that if any crime was committed by him in the transaction from which this prosecution arises, it is larceny by trick and device, and the argument, in effect, is: That, if the defendant conceived a corrupt motive and purpose in the transaction, it must have been before he finally obtained possession of the money under the circumstances above indicated, and that his resignation as guardian of the minor children, his suggestion and procurement of the appointment of Mrs. King to that office and thereupon his turning of the money over to her, followed by his insistence that she redeliver the money to him upon the pretext or representation that he could and would let it out at a high rate of interest, and the giving of his notes for the money, tended to disclose, if any crime at all, larceny by trick and device.

It may be conceded that the evidence is such that a verdict convicting the defendant of grand larceny might legally be sustained. In other words, it might well and justly be inferred from the evidence that the means resorted to by the defendant to secure a redelivery to him of possession of the money constituted a scheme through which a previously conceived intent to steal the money might the more readily be executed. But the evidence is not so conclusive upon that proposition as to compel no other conclusion, or to force the conclusion that, from the very beginning of the transaction

from which this prosecution directly ensues, the defendant formed or had formed the intent feloniously to steal or appropriate the money to his own private or personal use or purposes. The evidence, so far as the intent of the defendant was concerned, or as to when, if at all, the felonious intent was by him formed to appropriate the money to his own use, is necessarily circumstantial, and, under it, the jury could justly and consistently have arrived at either one of two conclusions, viz.: 1. That the defendant had, by trick and device, obtained possession of the money with the intent to appropriate it to his own personal use, which would constitute his crime that of larceny; or, 2. That he had no such intent when first he obtained redelivery of the possession of the money to misappropriate it or divert it from the purpose for which it was so transferred to his possession, but that, having obtained such possession for a specific purpose, which was to be for the benefit of the owner, he unlawfully and contrary to the terms of his trust himself used the money or diverted its use to his private purposes. The court, in language of singular perspicacity, explained to the jury the essential elements of the crime of embezzlement, as defined by section 506 of the Penal Code, and further instructed them that the evidence should be such as to show beyond a reasonable doubt that all those elements were present in the act of the defendant in the handling of the money, otherwise their verdict should be one of acquittal. Thus, it is manifest, the issue whether the act and the intent of the defendant as shown by the evidence did or did not constitute the crime of embezzlement was squarely put up to the jury, and their verdict of guilty of embezzlement as charged necessarily implies that the jury concluded, after a consideration of the evidence by the light of the instructions, that the evidence disclosed the commission of the crime of embezzlement and not that of larceny. As is well suggested by the attorney-general, there may be a number of implied findings embraced within the general finding of guilty of the crime as charged, and in this case, in which there were no special findings made, one of the findings necessarily implied is that the defendant did not intend to *steal* the draft, or its equivalent in money, at or before the time he received it, but that his intention to embezzle it, or appropriate it to his own private use, was conceived and became existent after he received the possession of

it. As in effect above declared, the fact as to the precise point of time at which the defendant conceived or formed the intention to take the money and use it for his own purposes, was one of the essential issues submitted to the jury, and the finding of that fact is necessarily comprehended within the general finding of guilty as charged.

The case of the *People* v. *Lewis*, 141 Cal. 543, [75 Pac. 189], is interesting in connection with the question of the effect of a general verdict in a criminal case in which, as here, either one of two inconsistent conclusions upon some vital fact might with perfect legal propriety be arrived at and sustained. In that case, the defendant was charged with and convicted in the superior court of Alameda County of the crime of taking away a female under the age of eighteen years from her father, without his consent, for the purpose of prostitution. (Pen. Code, sec. 267.) Her father lived in San Benito County, from where the defendant took the girl to Alameda County, in which the venue of the crime charged was laid in the information. The principal point in the case involved the challenging of the jurisdiction of the superior court of Alameda County to try the case. In support of that point, it was claimed that the evidence showed that, if the defendant committed the offense, it was committed entirely in San Benito County, and that therefore the superior court of Alameda County had no legal authority to try the case. Although the supreme court held that the offense defined by said section 267 is complete when there is a taking for the purpose of prostitution, and that the actual placing of such female in a house of prostitution is not by the statute made an essential element of the crime, the point as to jurisdiction was not sustained, the court saying that if the evidence was such as to *compel* the conclusion that the defendant took the girl from her father in San Benito County, with the intent to use her for the purposes of prostitution, it would then be necessary to hold that the offense was wholly committed in said county, and that no crime within the venue of the superior court of Alameda County would be shown, but that the evidence was such as to sustain the finding of the jury "to the effect that at the time the girl was given into the charge of defendant by her father there was no intent on defendant's part to use her for purposes of prostitution, and that such intent was not conceived by him until some time

after their arrival in Alameda County, while the girl was still in his actual charge, committed thereto by the father for a proper purpose.'' So in this case, if the evidence *compelled* the conclusion that the crime of larceny and not that of embezzlement had been committed, a much different situation would confront us, but, as shown, and as is plainly true, the evidence is such as amply to support the verdict as found and at the same time is such that it might perhaps properly be held sufficient to sustain a verdict of guilty of larceny had such a result been reached by the jury.

2. The claim that there is a further variance between the information and the proof in that the information charges the embezzlement of money and the evidence shows that the defendant did not receive money, but a bank draft, cannot be sustained. It is true that the defendant in the first instance received a draft for the money in Monterey County, but it is also true, as has been seen, that he deposited the draft in the name of his wife in a bank at Stockton immediately after he had received it, and thus it became a part of his account in said bank, available for his and his wife's purposes. In substantial effect, it became cash or money the moment he deposited the draft in his wife's name, for it was kept there subject to be paid out on the checks of either himself or his wife.

In the case of the *People* v. *Whalen,* 154 Cal. 472, [98 Pac. 194], where the defendant had been convicted of obtaining money by false pretenses and where it was made to appear that the prosecuting witness had given the defendant a check for a certain sum of money, a similar point was urged, and the court said: ''It may be conceded that if nothing more had been shown than the giving of the check, it would not prove the charge of having obtained the money, but we think the jury were fairly justified in concluding from the entire evidence that the check thus given was cashed by the defendant and the money obtained thereon. . . . There was nothing disclosed by the evidence to indicate that the defendant experienced any difficulty or delay in obtaining payment of the check. The facts concerning the payment of the money were all elicited upon the examination in chief of the two witnesses. There was no cross-examination on that subject, nor any attempt, at any stage of the case, to show that the check had not been paid in the usual course of business.''

In this case, the testimony of the bank cashier discloses that the defendant and his wife, after the draft was deposited in the latter's name by the former, checked against their account, of which the draft had been made a part, until said account was reduced to the sum of $38.74. That the draft was in fact turned into cash and the cash used by the defendant for his own private purposes, it seems to us the evidence unquestionably shows.

3. The jury were justified by the evidence in finding that if embezzlement of the money was committed by the defendant, such crime was committed in San Joaquin and not in Monterey County, as the defendant contends. Without considering whether, in any event, the venue of the alleged crime was in San Joaquin County by virtue of the provision of section 781 of the Penal Code, providing that "when a public offense is committed in part in one county and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in either county," a conclusive reply to the contention is that, as has been shown, the undisputed and, indeed, the indisputable, evidence discloses that the act of depositing the draft in the bank in the name of the wife of the defendant by the latter occurred in the city of Stockton, in San Joaquin County, and that, from this circumstance, the jury were justly warranted in concluding that the intent thus to misappropriate the money was formed in San Joaquin County. As is obviously true, no one can look into the human mind and interpret its operations, and, quite obviously, the intent with which an act is done or the time at which such intent is conceived and formed can be learned only from external circumstances so connected with the act itself as to afford reasonable ground for a reasonably definite inference as to the nature of the intent, if any accompanied the act, and as to the time, approximately, that such intent took on a definite form in the mind of the person committing the act. The intent may be formed, practically, concurrently with the commission of the act. In this case, there is no particular circumstance, except the fact of securing possession of the draft under the circumstances above shown, tending to indicate that the defendant, when he received the draft in Monterey County, intended to handle the money available on the draft in a dishonest way, or that his inten-

tion with respect to the transaction was then corrupt or dishonest. On the other hand, the act of depositing the draft in the bank at Stockton in such manner as to facilitate the withdrawal of the money thereon by his wife and himself does, as stated, constitute a circumstance tending to disclose that he formed the criminal intent with respect to the draft or money in San Joaquin County. Of course, these observations are not to be understood as implying a negative of the proposition, above stated, that the evidence, taken in its entirety, might be held to be sufficient to sustain a verdict of grand larceny in this case, if such a verdict had been returned.

4. The contention that no embezzlement of the money could take place without a demand by the owner for its return having been previously made upon the defendant is untenable. A demand for the return of property or money intrusted to a bailee or trustee, followed by a refusal to return the property or money, is not itself an element of the crime of embezzlement, but constitutes mere evidence of embezzlement. It is true that a demand, followed by a refusal, is sometimes indispensable evidence of embezzlement, but it is the fraudulent and felonious conversion of the money or other property that constitutes the offense, and that may often be proved without a demand. (*People* v. *Bidleman,* 104 Cal. 608, [38 Pac. 502]; *People* v. *Royce,* 106 Cal. 173, [37 Pac. 630, 39 Pac. 524]; *People* v. *Gordon,* 133 Cal. 328, [85 Am. St. Rep. 174, 65 Pac. 746]; *People* v. *Ward,* 134 Cal. 301, 304, [66 Pac. 372]; *People* v. *Goodrich,* 142 Cal. 216, 220, [75 Pac. 796]; *People* v. *Fisher,* 16 Cal. App. 271, 275, [116 Pac. 688]; Wharton's Criminal Law, sec. 1030.)

The cases—particularly those cited from our own supreme court—do not, as we understand them, hold that a demand for a return of the money or property, followed by a refusal to return it, is an essential prerequisite to the consummation of the crime of embezzlement. In the case of *People* v. *Tomlinson,* 66 Cal. 344, cited here by the defendant, it appeared that a party having no interest whatever in the money intrusted to the defendant, and of the embezzlement of which the accused was convicted, made a demand on the latter to return the money to its owner. The court very properly held, not that a demand by the owner upon the defendant to return the money and a refusal by the latter to return

it constituted essential acts in the completion of the offense of embezzlement, but that the demand made in that case and upon which the prosecution relied to prove the felonious conversion was not made by a party to whom the money belonged, nor by the evidence shown to have been upon his authority or for him. The other California cases cited by the defendant are: *People* v. *Wyman,* 102 Cal. 556, [36 Pac. 932]; *People* v. *Royce,* 106 Cal. 177, [37 Pac. 630, 39 Pac. 524]; *People* v. *Page,* 116 Cal. 396, [48 Pac. 326]. These cases hold, as the cases first above referred to declare, that the fact of demand and refusal is only an evidentiary matter and constitutes mere proof of the unlawful and felonious conversion, and in some cases may, as before stated, be indispensably necessary to the proof of the crime, but none of them holds that where, as in this case, there is other proof than that of demand and refusal sufficient to establish the felonious conversion of the money or other property intrusted to the defendant, it is essential to the consummation and establishment of the crime to show that there had been a demand made upon the defendant by the owner of the money or property for a return thereof and a refusal by the defendant to comply with such demand.

5. The objection that the conviction cannot be upheld because the precise time at which the alleged embezzlement was committed was not proved is without legal force. The evidence shows that the alleged crime was committed within three years before the filing of the information, which is the statutory period within which an indictment or information charging an offense of the character of the one charged here may be found or filed (Pen. Code, sec. 800), and it was sufficient to show that the crime was committed at any time within the period of limitation as prescribed by the section named.

6. The last point urged is, as above shown, that, as to the money alleged to have been embezzled, the relation of debtor and creditor subsisted between the defendant and Mrs. King. This proposition proceeds from the fact, as shown, that the defendant, upon receiving the draft, executed and delivered to Mrs. King his several promissory notes for the same, payable at different times, or when her minor children, to whom some of the money represented by the draft belonged, arrived, respectively, at their majority. But the answer to the propo-

sition is to be found in Mrs. King's testimony, which the jury evidently, and, indeed, presumptively, accepted and believed, that the money was not in fact loaned to the defendant, but was delivered over and intrusted to him with a clear and specific understanding or agreement between them that the money was by the defendant to be loaned to some other party at a high rate of interest, and that the defendant's promissory notes, voluntarily made and delivered by him, were to be only in the nature of evidence of the good faith of the transaction, or, in effect as stated by him, as security for the faithful execution of his trust and his final discharge therefrom by the return of the money and the accumulated interest upon the falling due of said notes. At no time, according to the testimony of Mrs. King, did the defendant claim, represent or pretend that he was to receive the money for his personal use, but, on the contrary, at all times declared and represented to Mrs. King that, in securing the money, his only purpose and sole intention were to loan the money to some other party, so that the minor children might derive some benefit from it before they were entitled to receive it, Mrs. King, as seen, further testifying that upon that representation and understanding alone she turned the draft over to the accused. Thus the jury were legally at liberty to find, as certainly they did find, that the relation created in the transaction between the defendant and Mrs. King was of a fiduciary character—that is, that the money was delivered to and held by him in trust for the benefit of Mrs. King, as the duly appointed and acting guardian of the minor children of herself and deceased husband, and was not loaned to the accused or delivered to him to be applied to his personal uses and purposes.

After a most painstaking examination of the record and the points pressed upon us for a reversal, we have not been able to discover any error justifying interference with the judgment and the order appealed from, and they are accordingly affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 8, 1917.