[Crim. No. 1352. Third Appellate District.—November 9, 1934.]

THE PEOPLE, Respondent, v. FORREST C. HILL, Appellant.

Clifford A. Russell, P. H. Johnson and Irving D. Gibson for Appellant.

U. S. Webb, Attorney-General, and Ralph H. Cowing, Deputy Attorney-General, for Respondent.

PLUMMER, J.—The defendant was convicted of the offense of embezzlement, and from the order of the court denying his motion for new trial, and entering judgment of conviction, this appeal is taken. The indictment upon which the appellant was arraigned and tried is in the following words and figures, to wit. (Omitting title):

"The Grand Jury of the County of Sacramento hereby accuses Forrest C. Hill of the crime of grand theft committed as follows: That on or about the 21st day of October, A. D. 1930, at the County of Sacramento, in the State of California, Forrest C. Hill did then and there wilfully, unlawfully and feloniously take the property of F. D. Raymond, consisting of $656.00, lawful money of the United States, of the value of $656.00, lawful money of the United States; and as a second, separate and distinct count, the People of the State of California complain against the said Forrest C. Hill for the crime of grand theft committed as follows: That on or about the 21st day of October, 1930, in the County of Sacramento, State of California, the said Forrest C. Hill did then and there wilfully, unlawfully and feloniously take the property of Ione W. Raymond, consisting of $325.00 lawful money of the United States, of the value of $325.00 lawful money of the United States; and as a third, separate and distinct count the People of the State of California complain against the said Forrest C. Hill for the crime of grand theft committed as follows: That on or about the 12th day of June, 1931, in the County of Sacramento, State of California, the said Forrest C. Hill did then and there wilfully, unlawfully and feloniously take the property of F. D. Raymond consisting of $480.63, lawful money of the United States, and of the value of $480.63, lawful money of the United States, contrary to the form, force and effect of the statute in such case made

and provided, and against the peace and dignity of the People of the State of California.

"NEIL R. MCALLISTER
"District Attorney of Sacramento County,
in the State of California.
"By ————"

To this indictment the appellant demurred, pleading that the offenses attempted to be set forth in the various counts are barred by the statute of limitations; likewise, that none of the three counts state facts sufficient to charge the defendant with any offense.

Upon this appeal a number of points are urged for reversal, to wit: That it appears on its face that it is barred by the statute of limitations; that the indictment as a whole is void because it shows on its face that it was not presented by the foreman of the grand jury; that count No. 3 of the indictment is void and of no effect for the reason that it is not an accusation by the grand jury of the county of Sacramento; that the court erred in refusing certain instructions modifying certain instructions proffered by the defendant, and in giving certain instructions at the request of the prosecution and of its own motion; that neither the *corpus delicti* nor the venue of the offense was proved; that the prosecution failed to prove that the defendant received any money.

Under the present method of pleading, embezzlement is charged as grand theft. The indictment in this case charges the offense to have been committed on or about the twenty-first day of October, 1930. The indictment was returned and filed on the twentieth day of October, 1933. By the provisions of section 800 of the Penal Code, the indictment charging the offenses under consideration herein must be returned within three years following the alleged date of the offense.

The contention is made by the appellant that as a year is described in the Political Code, section 3257 thereof, as being a period of 365 days, and owing to the fact that leap year intervened, more than three years had expired, counting each year as 365 days between the date of the alleged offense and the date of the filing of the indictment. This, however, we must conclude to be an erroneous conclu-

sion, as the language of the section specifies that the added day in leap year is simply, in law, only the day preceding. After defining the term "year" as 365 days, "half-year", and "quarter-year", the section reads: "And the added day of leap year, and the day immediately preceding, if they occur in any such period, must be reckoned together as one day." Thus, even though a leap year intervened between the alleged date of the offense and the date of the finding of the indictment, three periods of 365 days did not intervene between the date of the alleged offense and the filing of the indictment. The last day of the period was the day on which the indictment was returned, and must be included in calculating the time.

While a number of authorities have been cited, we do not need to refer to them, but will call attention simply to 62 C. J., page 1009.

Count 1 of the indictment as returned by the grand jury reads as follows:

"The Grand Jury of the County of Sacramento hereby accuses Forrest C. Hill of the crime of grand theft, committed as follows: That on or about the 21st day of October, A. D. 1930, at the County of Sacramento, in the State of California, Forrest C. Hill did then and there wilfully, unlawfully and feloniously take the property of F. D. Raymond consisting of lawful money of the United States."

Thereafter, following the plea of not guilty by the appellant, the district attorney was allowed to amend this count in the indictment by adding the words "of the value of $656, lawful money of the United States".

It is contended by the appellant that the indictment as presented, in so far as this count is concerned, was insufficient in substance, and that the addition of the amendment by the district attorney, as permitted by the court, was not warranted by the provisions of section 1008 of the Penal Code, and that the section referred to contains the following: "An indictment cannot be amended so as to change the offense charged, nor an information, so as to charge an offense not shown by the evidence taken at the preliminary examination." This argument is based upon the theory that to merely allege "$656.00, lawful money of the United States", is not a statement of value, and in making

this claim we are referred to the provisions of section 678 of the Penal Code which reads: "Whenever, in this Code, the character or grade of an offense or its punishment is made to depend upon the value of property, such value shall be estimated exclusively in United States Gold Coin." This section, however, we conclude refers to the question of testimony, and not to a matter of pleading. Section 4½ of article VI of the Constitution, as to errors in pleadings, is applicable, as the alleged error is not misleading or prejudicial.

Section 487 of the Penal Code, describing grand theft, so far as pertinent here, reads: "When the money, labor, or real or personal property taken is of a value exceeding $200.00," when it comes to proving the value as exceeding $200, then that value is to be measured or estimated in gold coin of the United States.

Even where the section is applied as to estimating value by the testimony, we find the following language in the case of *People* v. *Keach,* 28 Cal. App. 195 [151 Pac. 747], which we think applicable here: "So here, we think that the evidence above mentioned is sufficient to sustain the verdict so far as this question of value is concerned. And it would surely be catching at a straw to reverse this case merely because no witness had estimated the value 'in gold coin of the United States of America'."

In the case which we have just quoted the testimony had to do with 17 tons of hay of the value of $9 per ton. Gold coin was not mentioned in the testimony, nor does it appear from the case that gold coin was mentioned in the information. We think in this case it would be catching at a straw to say that $656, lawful money of the United States, is not of the value of $656, lawful money of the United States, whether the amendment made by the district attorney were or were not incorporated in the first count of the indictment. And it would likewise be catching at a straw to say that $656, lawful money of the United States, is not of the value of $200, as referred to in section 487 of the Penal Code. It is to be noted that the kind of money is not particularized in describing the crime of grand theft.

So far as the presentment of the indictment in open court in the presence of the grand jury is concerned, there is nothing upon the face of the instrument to show the contrary. Therefore, the holding in the case of *People* v. *Blackwell,* 27 Cal. 66, is controlling. It is there said: "It will be presumed that an indictment was presented to the court by the foreman of the grand jury, and in their presence, although that fact is not endorsed on it, if the record of the court shows nothing to the contrary."

None of the cases, so far as we have been able to examine them, hold that the indictment must specify value in gold coin. The case of *People* v. *Ball,* 14 Cal. 101 [73 Am. Dec. 631], specially relied upon by the appellant, does not support his contention. It was there held only that an indictment describing money as "$3000.00, lawful money of the United States", is insufficient. The particular denominations, or species of coin, must be set forth. This case was decided in 1859, and is based upon the old common-law forms of pleading as found in Wharton on Criminal Law, which is no longer controlling in this state.

Count 3 of the indictment stands out distinctly by itself. It reads: "And as a third, separate and distinct count, the People of the State of California complain against the said Forrest C. Hill for the crime of grand theft committed as follows:" (As hereinbefore described.) This is not an accusation by the grand jury. It is simply a statement by the grand jury that the People of the State of California complain against Forrest C. Hill.

While we might infer or presume that the grand jury took testimony in relation to the offense set forth in count 3, it is explicitly denied by the words which we have just set forth.

Under the law relating to preferring charges against defendants in this state the district attorney is permitted to charge a defendant with a criminal offense, but it must appear that the district attorney makes the charge. Likewise, a grand jury is authorized to accuse one with the commission of an offense, but it must appear upon the indictment that such accusation is by the grand jury, and not by someone else, or some other body of people. The

indictment must show that it was found solely by the grand jury, and upon its own investigation.

We think it is clear that that portion of the indictment described as count 3, is absolutely void, and must be, and is so held.

Count 2 was dismissed, and therefore needs no consideration.

■ Does the record show that the venue was properly laid in Sacramento County? We think so. The testimony is to the effect that the defendant was a lawyer and real estate broker living and maintaining offices in the city of Sacramento; that for a number of years he had been handling and investing loans for the prosecuting witness, Mr. Raymond, and also for Mrs. Raymond, the wife of the prosecuting witness. Prior to her death Mrs. Raymond would call up the office of the defendant in Sacramento and go over the loans. While we have found that count 3 in the indictment is void, the testimony as to counts 1 and 3 is so intermingled that it must be considered as a whole.

Two loans are involved in this action, which we will call the "B and T" loans. These loans were made by the defendant from his office in Sacramento, from moneys deposited with him for that purpose by Mr. and Mrs. Raymond. On or about the times alleged in the indictment, these loans were repaid through an abstract and title insurance company's office, by means of checks which were delivered to the defendant, aggregating the sum of $981. These checks were deposited in the California National Bank, in the city of Sacramento. The testimony introduced on the part of the prosecution does not show that the money represented by these checks was actually paid to the defendant. This omission, however, was supplied by the testimony of the defendant himself, who stated that he had received the money and used it in his own business. The defendant's business office, as we have stated, was located in the city of Sacramento. After receiving the money in the manner which we have stated, he failed and neglected to pay the same over to Mr. Raymond, and likewise failed to advise Mr. Raymond of the receipt of the money until after he had used the same in his own business. It is not necessary

that venue be established by direct evidence. It is sufficient if the circumstances shown in the record lead to such conclusion, and as shown in this case, the evidence almost unerringly does lead to the conclusion that the money was converted by the defendant in the county of Sacramento.

In the case of *People* v. *Peete,* 54 Cal. App. 333 [202 Pac. 51], the law in relation to the proof of venue is thus stated: "The venue, like any other fact in a criminal case, may be established by circumstantial evidence. And though no witness testified that Denton was murdered in Los Angeles County, the conviction being based entirely on circumstantial evidence, it is uncontradicted that the body was found in the City of Los Angeles in the basement of the house that Denton had leased to defendant, many miles from the county line, covered with a mound of dirt, canvas and other articles, showing that the body had been placed there by someone. This evidence, unexplained, was sufficient to justify the jury in concluding that the homicide was committed in Los Angeles County. In *Hawkins* v. *State,* 60 Neb. 380 [83 N. W. 198], it was held that evidence of the finding of the headless body of the person alleged to have been murdered in an old well which had been subsequently filled, situate in Frontier County, is sufficient, in the absence of other proof, to warrant the jury in concluding that the homicide was committed in that county. To the same effect is *People* v. *Kamaunu,* 110 Cal. 609 [42 Pac. 1090]. See, also, Wharton on Homicide, pages 901–902." See, also, *People* v. *Gordon,* 133 Cal. 328 [65 Pac. 746, 85 Am. St. Rep. 174]; *People* v. *Murphy,* 51 Cal. 376.

The objection that the *corpus delicti* was not proven is likewise untenable. The answer to this objection is contained in part in what we have said in relation to the question of venue.

The check to which we have referred and which was delivered to the defendant reads as follows:

"Fidelity Title Insurance Co.
913–915 8th Street
No. 4619 Escrow
Bergh

Sacramento, Cal. Oct. 21, 1930.
Pay to the order of F. C. Hill $981.00
Exactly Nine Hundred Eighty One Dollars exactly Dollars
 . 90–31 Fidelity Title Insurance Company

Seventh and J Street Branch ⎫ By Ross E. Pierce
 Bank of America ⎬ Secretary
 of California, ⎭ By A. M. Loveless
 Sacramento, Cal. Asst. Secty."

Endorsements:
"Pay to the order of the Pay only through
California National Bank Clearing House
of Sacramento, Calif. 90–33 Oct. 23, 1930.
Prior endorsements guar-
 anteed The California National
Hill Company Bank of
Clients Account (54) Sacramento, Calif.
F. C. Hill."
Perforations:
"90PD36
10–23–30."

It is true that after introducing testimony showing the delivery of this check to the defendant, and the indorsements thereon that it went through the California National Bank in the city of Sacramento, no testimony was introduced by the prosecution to the effect that the moneys represented by the check had actually been paid over to the defendant. This omission, as we have stated on the part of the testimony of the prosecution, was supplied by the testimony of the defendant himself. When called as a witness on his own behalf he testified as follows (in relation to the questions we are considering): "Q. What was the discussion, Mr. Hill, at that time about the Bergh loan and the Tanking loan, if any? A. Well, he seemed to know the loans had been paid off, and he came in to me and asked me about that. I told him the loans had been paid off, and I said, 'Fred, I have

been using the money in my business'; and I offered to give him a note or a contract covering the payment of it; and he didn't seem to be disturbed or distressed or angry, or any other emotion, and said,—'Well,' says, 'Let it go as a loan,' he said, 'and pay me interest on it'. Q. Now, did he ever make any other demand on you for the money? A. Well, yes. Q. Well, personally? A. In 1933, or summer of 1933. Q. And where was that? A. At my office. Q. And what did he say then? A. He asked me once about when I could repay the money I owed him. There was no particular amount of money; he just mentioned the money that I owed him, which he talked along those lines, and I told him, then, I didn't have any money, and offered again to give him a note or contract, and I said, 'If you are not satisfied with that, I will give you a mortgage on anything I have'; and I explained to him that times had been hard with me, and I had lost a large amount of money in real estate, and that the security I could give him would not be a first loan, but I told him I would give him a mortgage on anything I had to satisfy him. Q. What did he say to that, if anything? A. He didn't say anything, except that he didn't—yes, or no, or anything else. It was just allowed to drag along.''

Mr. Raymond's version of what was said differs from that of the defendant, in that he denied that he had ever loaned any money to Hill, or consented that the taking of the money by Hill should be considered as a loan. Irrespective of this, however, we do not see how any agreement on the part of Raymond to let the matter stand as a loan would relate back and nullify either the criminal intent or fraudulent conversion of the money to his own uses and purposes previously made. The transaction certainly justified the jury in inferring the appropriation of the money fraudulently and without the consent or knowledge of Raymond. The testimony shows conclusively that the fact of the misappropriation of the money was concealed from Mr. Raymond and was not mentioned by the defendant to Mr. Raymond until after Raymond had in some manner acquired knowledge thereof and called upon the defendant in relation thereto.

The testimony of the defendant, as we have set forth, having been voluntarily given by him under oath in open court, it is not subject to exclusion or any limitation in its

probative effects, under the rule relating to extrajudicial confessions or statements. Therefore, it is not necessary to review the cases cited by the appellant to the effect that extrajudicial confessions or statements of a defendant cannot be relied upon to sustain any part of the charge against him.

The law as to the admission and effect of confessions or statements made in open court by a defendant is, we think, correctly stated in 8 California Jurisprudence, page 108, to wit: "Voluntary admissions of guilt made by a defendant while testifying upon the trial of another charged with the same offense, or while testifying upon a preliminary examination of the charge against him, are competent evidence. Such statements are deemed voluntary," etc. (See, also, *People* v. *Fowler*, 178 Cal. 657 [174 Pac. 892].)

While the defendant in this case did not admit that he was guilty of embezzlement, he did state facts showing that he had, without the knowledge or consent of Raymond, converted the money in question to his own uses and purposes, and, as stated in 8 California Jurisprudence, page 34, the intent with which the money belonging to Raymond was converted by the defendant to his own uses and purposes is a matter for the jury, and are proved by the circumstances surrounding and connected with the transaction, just as specified in section 21 of the Penal Code: "The intent or intention is manifested by the circumstances connected with the offense and the sound mind and discretion of the accused."

Nor do the provisions of section 511 of the Penal Code come to the assistance of the defendant. That section reads: "Upon any indictment for embezzlement it is a sufficient defense that the property was appropriated openly and avowedly, and under a claim of title preferred in good faith, even though such claim is untenable. But this provision does not excuse the unlawful retention of the property of another to offset or pay demands held against him." Nor does the fact that the defendant intended subsequently to restore the property so converted to his own use, assist the defendant in any particular.

Section 512 of the Penal Code precludes such a defense. That the money was unlawfully retained by the defendant will be referred to later on.

■ That the *corpus delicti* of an offense may be shown just as other facts are established, we may refer to the recent case of *People* v. *Hudson,* 139 Cal. App. 543 [34 Pac. (2d) 741]. In that case extrajudicial confessions and admissions were introduced in evidence, and the language of the court must be considered with that in view. The court there said: "It is well settled, as appellant contends, that the *corpus delicti* must be proved by evidence outside of the declarations and admissions of the defendant; but it is equally well settled that to authorize the reception and consideration by the jury of evidence of extrajudicial confessions and admissions of a defendant, the prosecution is not required to establish the *corpus delicti* by proof as clear and convincing as is required to establish the fact of guilt. Slight or *prima facie* proof is all that is necessary. (*People* v. *Bollinger,* 196 Cal. 191 [237 Pac. 25]; *People* v. *Selby,* 198 Cal. 426 [245 Pac. 426]; *People* v. *McWilliams,* 117 Cal. App. 732 [4 Pac. (2d) 601]; *People* v. *Black,* 111 Cal. App. 90 [295 Pac. 87]; *People* v. *Bonilla,* 114 Cal. App. 219 [299 Pac. 784]; *People* v. *Wilcoxin,* 69 Cal. App. 267 [231 Pac. 377]; *People* v. *Alba,* 52 Cal. App. 603 [199 Pac. 894]; *People* v. *Vertrees,* 169 Cal. 404 [146 Pac. 890].) It may be proved by circumstances shown in evidence or by inferences drawn from facts shown. (*People* v. *Vicunia,* 105 Cal. App. 145 [286 Pac. 1061]; *People* v. *Ford,* 85 Cal. App. 258 [258 Pac. 1111].) Direct or positive evidence is not essential (*People* v. *Wilkins,* 158 Cal. 530 [111 Pac. 612]), nor is it necessary that such evidence in itself connect the defendant with the perpetration of the offense (*People* v. *Jones,* 123 Cal. 65 [55 Pac. 698]). The decisions hold also that such proof may consist of the testimony of the defendant himself when he voluntarily becomes a witness in the case and testifies to facts which tend to prove the *corpus delicti.* (*People* v. *Kelly,* 70 Cal. App. 519 [234 Pac. 110].)"

The concluding paragraph of the quotation is controlling here, where it reads: "The decisions hold that such proof may consist of the testimony of the defendant himself when he voluntarily becomes a witness in the case and testifies to facts which tend to prove a *corpus delicti.*"

In this particular we may call attention to the statement of the defendant to other witnesses relative to the misappro-

priation of the money belonging to Raymond, covering all the elements necessary to establish the offense of embezzlement under the charge of grand theft.

■ Admitting that the defendant appropriated the money to his own uses and purposes, appellant argues the existence of the relation of creditor and debtor between himself and the prosecuting witness Raymond. This contention, however, is not tenable in light of the facts disclosed in the record.

The record shows that the money involved in the "B and T" loans was sent to the defendant by Raymond for the purposes of being loaned. The record likewise shows that on numerous previous occasions money had been sent by the Raymonds to the defendant for the purposes of loaning. It it not disputed that the money was sent by the Raymonds to the defendant for the purposes of loaning. Such facts constituted and created a trust relationship between the defendant and Raymond. The fact that the defendant was under obligations to account to Raymond for the money so received to be loaned by him, and would be legally liable to Raymond for all moneys collected by him on account of loans so made, does not establish the relationship known in law as debtor and creditor, or militate in any way the trust relationship with reference to the money in question. Nor would the fact that Raymond and the defendant had in some deal which is mentioned in the testimony as the "cemetery" deal, the circumstances of which are not disclosed, created the relationship of debtor and creditor between the two, convert the trust relationship between Raymond and the defendant as to the moneys sent by Raymond to the defendant for the specific purposes of being loaned by him to others than himself, and the fact that the defendant thereafter collected the money and appropriated it to his own uses and purposes, would not annul the relationship of trustor and *cestui que trust* and create that of debtor and creditor as to the moneys so converted.

■ In view of the fact that the check set forth herein was delivered to the defendant, and the indictment returned within the three years required by the codes, the objection of the appellant that the conversion of the money is not shown to have taken place within the statute of limitations requires no consideration, the facts set forth being a complete answer.

The objection of the appellant that no sufficient demand was made by Raymond for the return of the money, we think is completely answered by the opinion in the case of *People* v. *Crane,* 34 Cal. App. 599 [168 Pac. 377], where this court, speaking through Mr. Justice Hart, set forth the law as follows: "The contention that no embezzlement of the money could take place without a demand by the owner for its return having been previously made upon the defendant is untenable. A demand for the return of property or money intrusted to a bailee or trustee, followed by a refusal to return the property or money, is not itself an element of the crime of embezzlement, but constitutes mere evidence of embezzlement. It is true that a demand, followed by a refusal, is sometimes indispensable evidence of embezzlement, but it is the fraudulent and felonious conversion of the money or other property that constitutes the offense, and that may often be proved without a demand. (*People* v. *Bidleman,* 104 Cal. 608 [38 Pac. 502]; *People* v. *Royce,* 106 Cal. 173 [37 Pac. 630, 39 Pac. 524]; *People* v. *Gordon,* 133 Cal. 328 [85 Am. St. Rep. 174, 65 Pac. 746]; *People* v. *Ward,* 134 Cal. 301, 304 [66 Pac. 372]; *People* v. *Goodrich,* 142 Cal. 216, 220 [75 Pac. 796]; *People* v. *Fisher,* 16 Cal. App. 271, 275 [116 Pac. 688]; Wharton's Criminal Law, sec. 1030.)''

The facts in the above case are very similar to the facts contained in the record before us. Crane had been entrusted with the loaning and collection of money by one Matilda King. The money was loaned, collected by Crane in the form of a check or draft; the money was deposited by Crane to the credit of himself and his wife, and thereafter checked out and converted to his own uses and purposes. This was held to constitute a sufficient basis for sustaining the verdict of the jury finding the defendant guilty of embezzlement.

As bearing upon the question of intent with which the money was converted by the defendant, and also, as controverting any claim that might be made under the provisions of section 511 of the Penal Code, the jury was entitled to take into consideration the time which elapsed, running into months, between the receipt of the check dated October 21, 1930, before any disclosure was made or information conveyed to Raymond or any other person, as to what had been done with the money, and also, the further fact that no information was conveyed to Raymond, until Raymond,

having learned otherwise of the payment of the "B and T" loans, confronted the defendant with questions concerning the money.

Notwithstanding the fact that the check for $981 heretofore referred to as having been delivered to the defendant, covered payment of the Bergh note, the note by Bergh in favor of Raymond, for which the payment was made, was allowed to remain in the possession of Raymond for a great many months, and until it was turned over by Raymond to the witness Butts, as hereinafter mentioned. During this time no notification appears to have been made by Hill to Raymond of the payment of the Bergh note. It was not called for by Hill to be delivered to the makers thereof after its payment. The note in question was dated November 22, 1929, for the sum of $656 principal. The check in payment of this note was delivered to the defendant in compliance with his letter dated September 27, 1930, addressed to the "Fidelity Insurance Company, Sacramento, California," and read as follows: "Gentlemen: I hand you herewith the Bergh reconveyances, for which please collect $981.00 before delivering. I will get the papers later as they are held up by a client up in the country. Very truly, (Signed) Forrest C. Hill."

The papers referred to were not obtained by the defendant from his client, whom the record shows resided in Roseville, a distance of about seventeen miles from the city of Sacramento. The jury had a right to consider this failure on the part of the defendant to notify Raymond of the payment of the note and secure its possession for delivery to the makers thereof, who, according to the record, had made payment in full. The jury was certainly justified in drawing the inference that this failure to notify Raymond that the note had been paid was for the purpose of concealing the fact that the money had been converted by the defendant to his own uses and purposes.

Bearing upon the question of intent, and also as negativing the provisions of section 511 of the Penal Code as a defense to this action, the testimony of the witness Butts may be properly referred to. This witness testified that in October, 1933, Raymond came to his office bringing papers relating to business theretofore transacted for him by the defendant. Among the papers brought to the witness by

Raymond was the Bergh note. After testifying that he had known the defendant for about three years, the following questions were propounded to the witness, and answered as herein set forth: "Q. Mr. Butts, I show you People's exhibit No. 1, being a note made payable to F. D. Raymond, in the sum of $656.00, and ask you if you have seen that note before, and when? A. I have; on the 2nd day of October, 1933. Q. And what was the occasion of your seeing it at that time? A. Mr. Raymond gave it to me. Q. For what purpose? A. For the purpose of collection. Q. Now, did you, after that time, have any conversation with the defendant Forrest Hill, regarding the note? A. I did. Q. When was it? A. That same night, October 2, 1933. Q. Where? A. In my office—North Sacramento. Q. And who was present? A. Mr. Hill and myself. Q. And what was the conversation? A. I told Mr. Hill that Mr. Raymond had brought me a bunch of papers, and I would like to get some information from him, as he had handled Mr. Raymond's business previously. Mr. Hill said he would help me, and I showed him a bunch of notes. Q. Now, just referring to this one note, will you say just what the conversation was with regard to this note, the Bergh note? A. He told me that they were having hard luck, or something of that kind, or that he hadn't been able to collect on it. . . . Q. Now, did you afterwards have any further conversation with him regarding the same note? A. I did. Q. When was that? A. My recollection is it was Wednesday afternoon, October 4th. . . . Q. Who was present? A. Mr. Skirving, Mr. Hill and myself. Q. Now, what was the conversation regarding the Bergh note at that time? A. Mr. Hill admitted that he had collected the money and kept it. Q. Did he say when? A. No, he didn't say when until I referred to some notes that I had gotten from the county recorder's office, and I asked him if it was not a fact that the note was paid off in October, 1930, and asked him if he got the money, and he said the records were correct, that he had received the money. . . . Q. Did you at any other time have a conversation with Mr. Hill regarding the Bergh note? A. I did. Q. When was that? A. Three or four days subsequent thereto; in Mr. Jim Meredith's office. Q. Who was present at that time? A. Mr. Meredith, Mr. Hill, Mr. Hill's son, and myself. Q. And what was the conversation at that time? A. Mr.

Hill admitted collecting the money, and keeping it, and Mr. Hill wanted to pay back, wanted to give me a deed of trust on his wife's apartment house and some property on Stockton Boulevard, and his home as security for the money. . . . Q. What were his exact words, Mr. Butts? A. He said, 'I collected the money and kept it.' I said, 'Then you stole it'; and he said, 'Yes.' ''

The testimony of this witness was substantially the same regarding the money that had been received in payment of the Tanking note which we have called the ''T'' note involved in count No. 3, which we have held should be set aside, and therefore, the testimony in relation thereto, of this witness, is not further set forth.

The testimony of Mr. Meredith relative to the conversation had in Mr. Butts' presence is simply to the effect that he did not recall Hill stating that he had stolen the money. It does not negative anything with regard to the statement of Mr. Hill that he had received the money in question and kept it.

As a ground for reversal the appellant urges misconduct on behalf of counsel for the People. It appears from the record that a certain deed of trust had been executed to secure the repayment of one of the loans made by the defendant for Mr. Raymond, which deed of trust was never recorded; that the original deed of trust was never sent to Mr. Raymond, but a copy thereof was made out by the defendant, including the signatures of the makers of the note in the deed of trust securing repayment, and that subsequently a chattel mortgage was executed covering the loan mentioned in the deed of trust, with an additional sum, and the original deed of trust was never placed on record. Some question came up in the course of the questioning of the witness Butts with regard to the authenticity of the copy of the deed of trust and the chattel mortgage, and one of counsel for the People, in finding the chattel mortgage and handing it to counsel for the defendant, accompanied it with this remark: ''Here it is, forgery and all.'' The court immediately upon the request of the defendant, admonished the jury to pay no attention to the remark of counsel.

In view of the testimony elicited by counsel for appellant on cross-examination of the witness Butts we fail to see just how a complaint can be well founded against the remark of

one of counsel for the People. The following is cross-examination to which we refer, which does not seem to have been referred to or mentioned in the direct testimony of the witness Butts and is exclusively matters brought out on cross-examination, to wit: "Q. Now, on October 4th was anybody else present besides Skirving, Hill and yourself? A. No, sir. Q. You had a discussion there, didn't you, with Mr. Hill? A. Yes. Q. And at that time you made a demand on Mr. Hill for $2074.00? A. Yes, sir, after Mr. Hill told me that he had forged Fred and Lizzie Davis' name to the deed of trust, and had got $175.00 from Raymond and had paid the interest on it for three years at one per cent a month until it was outlawed; and when he got through I said: 'Forrest you are in an awful shape; the best thing we can do is for you to let us add all these things up and you give me a check for it, and let's forget it'; and we added it up and it came to $2074.43, and Mr. Hill told me that he had forged their names to the deed of trust, got the $175.00 from Mr. Raymond, and had kept the money, and had faked the recording of Root & Berger's name on it, and he had told me the loan was good, after I had been to Skirving's office, and when I checked the record and asked him whether the record was correct, he told me he guessed the records were right, and that he forged the deed of trust."

No motion was interposed to strike out any portion of this answer of the witness Butts.

The witness further testified that he asked Hill to give him a check for the money, and Hill replied: "I can give you anything but money."

After calling out and allowing to remain in the record the testimony just quoted, it certainly does not lie in the mouth of the appellant to insist that the jury was prejudiced by the chance remark of one of counsel for the prosecution which the court immediately ordered stricken from the record, and also admonished the jury to pay no attention thereto.

What we have set forth likewise answers the contention that the defendant was prejudiced by the remarks of counsel for the prosecution during the argument of the cause to the jury.

We will first consider the last contention of the appellant, that the court prejudicially erred in its instruc-

tions to the jury, in that it did not specifically advise the jury that all of the jurors must concur in finding a verdict as to each count.

Upon the return of the jury with its verdicts which had been submitted by the court to the jury, one form of verdict referring to count No. 1, and one form of verdict referring to count No. 3, the jurors, at the request of the appellant, were polled, and each juror, as his name was called, responded that each verdict was his verdict; that is, all twelve jurors answered that verdict covering count No. 1 was his verdict, and all jurors responded to the question concerning count No. 3 that such verdict was his verdict, so that the jurors properly found their verdict, irrespective of the alleged error on the part of the court.

▰▰ An examination of the instructions given to the jury does reveal the fact that the court did not give, in exact language, the provisions of section 503 of the Penal Code, which defines embezzlement as the fraudulent appropriation of property by a person to whom it has been entrusted. However, the court did quite fully advise the jury as to the law governing the cause under consideration. The jury was advised in the exact language of the code defining grand theft, that the defendant was presumed to be innocent until proven guilty.

The rule as to reasonable doubt, as set forth in the codes, was given to the jury in the identical language of the code, that the burden of proof always rested upon the People; that the defendant was to be tried only for the offense of which he was charged; that they should take into consideration all the evidence and fairly consider it all. The jury was likewise instructed that if they found that the money in question was appropriated openly and avowedly, and under a claim of title preferred in good faith, then the defendant should be acquitted. Also, that if they had any reasonable doubt as to the felonious intent of the defendant to convert the money to his own use, the defendant should be acquitted. Further, that in the crime of grand theft, and before the jury could find the defendant guilty, they must find from the evidence that he intended to convert to his own use the money, and to cheat and defraud the prosecuting witness out of the same; and that, if they believed from the evidence

there was a lack of criminal intent, the defendant should be acquitted.

The court further instructed the jury, in instruction No. 21, as follows:

"You are instructed that to constitute grand theft under our statute, you must believe from the evidence that the accused must have intended to permanently deprive the prosecuting witness of the money named in the indictment; but if you believe from the evidence that the money shown to have been retained by defendant was so retained by him under a belief honestly entertained by him that he had the right to retain it, first as a loan to him, and later, openly and avowedly that he had a tenable claim against the prosecuting witness for attorneys' fees and other money, then defendant would not be guilty of the charge laid in the indictment, even though defendant were later found to have in fact no right to retain the money, for in such cases the fraudulent intent necessary to constitute grand theft would be absent, and defendant should be acquitted."

And also, at the request of the defendant, gave the further instruction numbered 22:

"You are instructed, that if you shall find from the evidence that the confidential relation between the prosecuting witness and the defendant terminated in the month of December, 1932; that in said December, 1932, said prosecuting witness was fully advised that the money mentioned in the indictments had been fully paid him, and that the said prosecuting witness then consented to defendant's holding the money as a loan until a later date or time that was not definitely fixed for its return, and after the confidential relation between the prosecuting witness and defendant had ceased, and the money was so held by defendant, WITH THE CONSENT OF THE PROSECUTING WITNESS; and if you shall further find that no demand by the prosecuting witness, nor by any one on his behalf, was made upon the defendant before the date of his arrest, you are instructed that the prosecution has failed to establish the essential element of the crime of embezzlement—the fraudulent intent of the defendant to appropriate the money to his own use, and your verdict must be not guilty."

This instruction was more favorable to the defendant than he was entitled to. The misappropriation was alleged to

have taken place in 1930, and as said in *State* v. *Aceto,* 5 Boyce (Del.), 597 [96 Atl. 206], no subsequent arrangement could mitigate the offense or bar the state's right of prosecution. (See, also, *Waters* v. *State,* 15 Ga. App. 342 [83 S. E. 200]; *State* v. *Frisch,* 45 La. Ann. 1283 [14 So. 132]; *State* v. *Chapin,* 74 Or. 346 [144 Pac. 1187].)

The jury was further instructed, by instruction No. 9, that if they found from the evidence in the case that the defendant, at the time he took the money, was then and there acting in the capacity of an agent of Fred W. Raymond, and that he obtained and held said money in his trust capacity, and at said time, said money belonged to his principal, Fred W. Raymond, and that he converted it to his own use with the full knowledge and consent of Fred W. Raymond, the defendant must be acquitted. Our attention has not been called to any evidence supporting the theory that the money was converted to the uses and purposes of the defendant, with the full knowledge or consent of Fred W. Raymond. The defendant's version of the transaction shows that the money had been converted previous to the alleged consent on the part of Raymond that it might be considered a loan.

The court properly instructed the jury that the intent with which the act was committed was a matter entirely within their province and should be determined from all the testimony in the case. Likewise, the circumstantial evidence and direct evidence should be considered in determining their verdict, and that the testimony must be inconsistent with any reasonable theory of innocence, and must show the defendant's guilt beyond any reasonable doubt.

From the foregoing it is evident, just as claimed by counsel for the People, that the four elements constituting embezzlement were contained and defined within the instructions given by the court to the jury, to wit: 1st. That the defendant must have been acting in the capacity of an agent at the time of the conversion of the money. 2d. That the defendant obtained and held the money in a trust capacity. 3d. That the money taken belonged to Raymond. 4th. That the defendant converted the money to his own use in violation of his trust.

As the instructions covered all the essential elements which we have mentioned, it follows that the court did not

err in eliminating a repetition of such elements from the defendant's proposed instruction No. 9. A comparison of the refused instructions with the instructions given leads to the conclusion that all pertinent matters contained in the refused instructions were covered by the instructions actually given. From a careful consideration of the instructions it is clear that no prejudice could possibly have resulted to the defendant from the refusal of the court to give the proffered instructions urged upon our attention.

A review of the testimony which we have set forth, showing conclusively that this court could not order reversal on the grounds of a miscarriage of justice, would cure any technical defects or omissions in the instructions, as alleged by the appellant.

 Lastly, it is contended that the court erred in refusing to grant appellant's motion for a new trial. This is based upon the fact that the Davis trust deed was brought to the attention of the appellant after the trial of this case had been terminated. It appears that this trust deed was in the possession of a witness by the name of Davenport. Davenport, when asked as to the whereabouts of the trust deed, replied as follows: ''Q. Where is the one that he gave back to you? A. Must have it in my papers. Q. And can you produce it? A. I don't know. Q. Will you produce it? A. I have a box of stuff; I will look through them.'' Later on it appears that this witness looked through the box referred to and found the trust deed. However, the execution of the trust deed referred to by Davenport was fully testified to by the witness Davis, who, with his wife, had executed the same; so that all the facts concerning the same were before the jury before rendering its verdict herein. The fact of having the trust deed to exhibit to a jury would only be cumulative of the testimony already given.

 We do not need to cite the cases to the effect that the granting or refusing of a new trial rests largely in the discretion of the trial court. Much less would this court be authorized to grant a new trial simply for the purposes of permitting the appellant to introduce cumulative evidence.

Finding no error in the record justifying a reversal, other than as herein stated, it follows that the conviction and judgment based upon count No. 3 in the indictment must

be and the same is hereby set aside. The statute of limitations having run, no new trial is ordered as to the offense attempted to be charged in count No. 3.

It is further ordered that the order of the court denying a new trial as to count No. 1, and the judgment based thereon, be and the same are hereby affirmed.

Pullen, P. J., and Thompson, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 24, 1934, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 6, 1934.