[Crim. No. 3726.   Second Dist., Div. Two.   Nov. 19, 1943.]

THE PEOPLE, Respondent, v. SOL BRAIKER et al., Appellants.

George D. Higgins and Leonard Wilson for Appellants.

Robert W. Kenny, Attorney General, R. S. McLaughlin, Deputy Attorney General, Fred N. Howser, District Attorney, and Jere J. Sullivan and Harry C. Johnstone, Deputies District Attorney, for Respondent.

WOOD (W. J.), J.—In each of nineteen counts of an information defendants were charged with the crime of grand theft. At a trial before the court without a jury they were convicted on seven of the counts and were found not guilty on the remaining counts. They have appealed from the judgments and from the orders denying their motions for a new

trial, contending that the evidence is insufficient to sustain the convictions.

Prior to October 15, 1941, defendant Braiker had been engaged in the business of constructing homes either as a contractor or as an employee of others and defendant Rose had been employed as a salesman of small homes for various concerns. On that date Braiker and Rose entered into a contract in which it was provided that Braiker should be the contractor and Rose should be the salesman in the business of building and selling small homes. It was provided in this contract: "Contractor agrees to hire and does hereby hire and employ the salesman to act as the selling agent of the contractor in the business to be conducted by the contractor under the name of S. Braiker, at 11430 West Pico Boulevard, Los Angeles, California, where the said contractor shall maintain a general sales office for the sale of the buildings to be constructed by him. Contractor agrees to pay all of the necessary costs of maintaining and operating said office, including, but not limited to, telephone, advertising, secretarial costs, stationery, postage and all expenses incidental to the operation of a building construction office." It was further provided in the contract that Rose should devote all of his time to the business to be conducted and as full compensation he should receive $50 for each house sold, whether it be sold by him or by someone else, the "commissions" to be payable to Rose upon the final consummation of the deals and the transfer and the conveyance of title to the purchasers.

Operations were commenced by defendants shortly after they entered into their contract and Braiker constructed a model house on the lot adjoining their office. Rose handled all of the preliminary work connected with the sales, the obtaining of payments, the arranging for the loans and the preparation of plans and specifications. Braiker did the actual construction work. The same general procedure was followed by defendants in all the operations. When a customer entered the premises, Rose, or one of the salesmen working under him, would show the customer through the model house and take him out to see vacant lots. The customer would, if desirous of purchasing, select a lot and make a deposit in excess of $200 to be used in the purchase of the lot in the event a Federal Housing Administration loan could be secured to build the house. The customer's check was made payable to Braiker and deposited in Braiker's bank account. The customer and the salesman signed a deposit receipt containing

these provisions, the blanks being filled in according to the prices agreed upon:

"Sol Braiker
11430 W. Pico Boulevard
West Los Angeles, California
Arizona 92247

Date.....................

"Gentlemen:

"We hand you herewith the sum of $...... as a deposit on a total down payment of $......, to purchase for us (or if you own the same, to hold for us) the following described parcel of property:

"To wit: ...........................................
(Lot Block Tract City Street and No.)

which we agree to purchase for the sum of $....... We have selected your Plan.... No....., and agreed to have you build a similar house for us on the lot above described, to cost us $....... We agree to sign all necessary application papers for loans. If the loans are approved, we agree to pay you an additional sum of $...... and sign and execute all necessary loan papers and contracts to complete the transaction. We will assign the proceeds of said loan upon demand to Sol Braiker, or their nominee.

"The payments to be made under such loans shall be approximately as the following schedule indicates, to wit:

$......30 days from date      $......150 days from date
$......60 days from date      $......180 days from date
$......90 days from date      $......210 days from date
$......120 days from date     $......240 days from date

and shall continue monthly until the full amount of said loans are paid. Said loans shall include interest at a rate indicated on face of trust deeds or notes per annum on the unpaid balance. These monthly payments do not include taxes or fire insurance.

"In the event this transaction is not completed due to our inability to qualify for said loan, it is understood that our deposit will be returned to us in the full amount, less $10.00 expended by you for services.

"It is further agreed and understood that if this transaction is canceled by us for any reason other than our inability to qualify for said loan, then in that event our full deposit shall be retained by you for services rendered.

"We authorize you to secure for us a conditional F.H.A.

Title 2 commitment and agree to sign an application and all necessary papers upon demand for an F.H.A. Title 2...., year loan. Upon acceptance by F.H.A. of such Title 2 loan, we understand that the payments will be approximately $.... per month, including taxes, insurance, principal and interest.

"We understand that there is no guarantee on the part of your Company that such loans will be forthcoming.

"This application is subject to a final contract to be executed by Sol. Braiker, and ourselves. All plans and specifications are subject to F.H.A. changes.

"Contractor does not guarantee said loan to convert to a Title II loan.

"Contract price does not include water meter."

Defendants did not own any of the lots described in the deposit receipts and none of the lots involved in the transactions covered by the counts on which defendants were convicted were purchased, nor were any houses built thereon. No final contracts were ever made by Braiker or Rose with the customers. Nor were the amounts of the deposits made by the customers ever returned to them notwithstanding proper demand was made for their return. The deposits made by the customers were used to pay the general expenses of the business, including the cost of constructing a number of homes for customers other than those mentioned in the various counts of the information. From time to time Braiker instructed Rose to pay bills of the business out of the funds collected and in such instances Rose paid the bills in cash and took receipts therefor.

Deposits were placed by Braiker in a separate bank account but later the deposits were placed in the general account. Mr. Braiker testified: "I have taken out a thousand dollars from the checking account and put into a separate account so that money that came in from the buildings, while they were under construction, should not mix in with deposits given by depositors; and at that time, when Mr. Rose found out that, he said for me to take that money out and put it back again in the checking account. Of course, he takes care of the financial end, and it was better to have it in one account. Q. Then what did you do?. A. I took it out and put it back as he told me. Q. You redeposited it in the general account? A. Yes." There is evidence in the record from which the court could reasonably infer that part of the deposits were used for the living expenses of defendants. The bookkeeper testified: "All those moneys that were deposited as reflected by

the books to the bank account of Sol Braiker, were dispersed and used for the operation of the business? A. By Sol Braiker? Q. Or by anyone, whoever wrote the checks? A. No, not all checks were used for the business. Q. Some of it was for the living expenses of Mr. Braiker and Mr. Rose? A. Not charged to the company expenses, no. Q. Did you charge that to Mr. Rose and Mr. Braiker? A. Drawing account, yes. Q. All right. What else was the money dispersed for other than the business, drawing account of Mr. Braiker and Mr. Rose? A. That is all.''

Mr. Braiker testified that after the commencement of the war it became very difficult for him to secure materials and that the great difficulties of the construction business then encountered, together with the action of the prosecuting attorneys in causing his arrest, made it impossible for him to carry on the business; that he had no fraudulent intent and that his inability to return the deposits was due to conditions beyond his control.

The attorney general contends that the sums deposited by the customers constituted a trust fund which defendants had no right to use except for the express purpose for which the deposits were made and that when defendants diverted the deposits to any other use they in fact embezzled them. An examination of the deposit receipt bears out this contention. It is therein expressly stated that the sum delivered is a deposit to be used for the purchase for the customer of the lot described in the receipt. It is true that this statement is followed by language by which the customer agreed to have built a house similar to the model house for a given sum and that the parties had agreed upon the purchase of the lot and the erection of a building thereon if a proper loan could be negotiated. But it is clear that two separate transactions were included in the general agreement, the purchase of the lot for a given sum, and the erection of a building for a given sum. It is provided that the whole transaction should fail and the deposit be returned if the F.H.A. loan should not be obtained. The only construction to be placed upon the part of the agreement referring to the purchase of the lot is that the deposit therein mentioned constituted a trust fund. The addition of the further provision that a house should be erected upon the lot for a stated sum does not change the status of the deposit from that of a trust fund and make it available for the general business uses of the contractor. In-

deed, Mr. Braiker stated in the offices of the district attorney that he knew that the deposit constituted a trust fund.

The claim of Braiker that he intended to use the trust funds in the construction of the houses and that he had no intention of permanently depriving the customers of their property does not constitute a defense, for it is the immediate breach of the trust which makes the offense. The crimes were completed when defendants diverted the trust funds from the uses for which the funds had been entrusted to them. (*People* v. *Talbot*, 220 Cal. 3 [28 P.2d 1057].) The commencement of the war and the resulting difficulties encountered by builders did not authorize defendants to commit the criminal acts of diverting trust funds to improper uses.

In arguing that defendants had the right to use the deposit money defendants rely upon *People* v. *Holder*, 53 Cal. App. 45 [199 P. 832], and *People* v. *Bullock*, 92 Cal.App. 785 [268 P. 1059]. In the Holder case the defendant entered into a contract with the *owner* of a lot for the construction of a house. A part of the stipulated contract price was paid to the defendant, who failed to use it for labor and materials. The reviewing court held that Holder was not guilty of embezzlement because the money thus paid to him was his own property and was not the property of any other person. In the Bullock case the *owner* of a small dwelling house contracted with the defendant to remodel the house for the sum of $2,500. The reviewing court held that the property alleged to have been embezzled was paid to the defendant under and by virtue of the building contract and that the money received was not held in trust but was the property of the defendant under the contract. A very different situation appears in the present case, where the customers, not being the owners of the lots in question, paid deposits to defendants to be used in the purchase of the lots.

Defendant Rose argues that as to him in particular the evidence is insufficient since he was to receive only the sum of $50 for the sale of each house. There are many circumstances disclosed by the record which involve defendant Rose and make him criminally responsible. He conversed daily with Braiker during the progress of the operations of the concern and was well informed concerning its affairs. He made admissions in the district attorney's office that he was aware that the deposits were trust funds. The funds in the separate trust account were placed in the general account at the suggestion of Rose and were withdrawn by Rose by

check. Rose also personally paid general bills of the business out of the money received as deposits.

The judgments and the orders denying new trials are affirmed.

Moore, P. J., and McComb, J., concurred.