[Crim. No. 718.    Fourth Dist.    Apr. 7, 1949.]

THE PEOPLE, Respondent, v. WARREN F. APPLEGATE, Appellant.

James B. Abbey for Appellant.

Fred N. Howser, Attorney General, Henry A. Dietz, Deputy Attorney General, James Don Keller, District Attorney, and Woodrow Wilson, Deputy District Attorney, for Respondent.

GRIFFIN, J.—Defendant was charged with grand theft in the language of the statute (Pen. Code, §§ 484, 951 and 952), that on September 15, 1947, he took "the personal property of the United Flower Growers' Association, a corporation, consisting of" $9,800, to which he entered a plea of not guilty. A jury returned a verdict of guilty. Defendant appealed.

It is conceded by defendant that "embezzlement," as that offense was previously known, may be charged and proved under this form of information. (*People* v. *Dunn*, 40 Cal. App.2d 6 [104 P.2d 119].) ▉ It is rightfully argued that the change in the offense was one merely in nomenclature and that the burden of proving all of the elements of the former offense still remains the duty of the prosecution. (*People* v. *Stevenson*, 103 Cal.App. 82 [284 P. 487].) The principal question raised on this appeal is the sufficiency of the evidence to support a charge of "embezzlement," as that crime was previously known.

The First National Real Estate and Management Company, a corporation, hereinafter referred to as the "Corporation," was incorporated in 1944. Prior to that time the company had existed as a partnership composed of one Turk, Wern and defendant Applegate. When the corporation was formed, the interests of the three partners were closed out on their books and the same interests were entered in the corporation books. Shortly thereafter, both Wern and Turk withdrew, and all the stock was then held by defendant. Its business consisted of acting as real estate broker in buying and selling property of others as well as its own. Applegate had no real estate broker's license. The corporation operated under the brokers' licenses of the various officers. It incidentally appears that Applegate, in addition to his many other activities, conducted a training school for applicants for real estate brokers' licenses and charged a tuition fee for such service. Myron Donley was one of his many trainees. After passing the examination their licenses were kept in the office of the corporation and at times there were as high as 100 licenses on the wall.

Applegate was the general manager of the corporation and held a general power of attorney to, and did, transact all of the corporation's business affairs. He selected its officers and apparently controlled their actions, and when one was selected he was given a stock certificate, representing three shares, which defendant required to be immediately endorsed in

blank by the officer and returned to him. In April, 1947, Mr. Donley was thus selected to be president of the corporation. Applegate told him that he (Applegate) owned all of the stock of the corporation and all of its assets. Donley testified that he was not receiving any salary as president; that he had no authority in directing or in managing the corporation but this was all done by defendant. A Mrs. Benson was appointed office manager. She likewise held a broker's license. Early in 1947, the corporation purchased, on contract, a tract of land near Encinitas and offered the tract in smaller lots to various purchasers.

One Clark and defendant headed a flower-growing partnership company which had entered into certain agreements with purchasers of land from the corporation to grow flowers on land previously sold by the corporation to such purchasers. In 1947, this flower-growing company went into receivership. Applegate conceived the idea of promoting a new corporation to enter the flower-growing business, and in the summer of 1947, 15 of these lots were sold to purchasers and each agreed with the corporation, through the defendant manager, or its selling agent, that they would pay to that corporation, for the benefit of the new corporation to be formed, an additional sum of money (totaling $17,600) to be used by the latter to grow flowers on the land when that new corporation was formed. The money was then to be turned over to it and written contracts between that new corporation and the growers were to follow. Of the $17,600 paid in for this purpose, $7,800 was in the form of checks made payable directly to the United Flower Growers' Association, hereinafter referred to as the association. The balance, or $9,800, was in cash or checks payable to the corporation. The $7,800 in checks was given by the defendant to Helen Benson and was deposited in an account opened on September 2, 1947, eight days before the association was formed, in the name of "United Flower Growers' Association." Applegate, Donley and Benson had authority to draw on that account until the association started to function, at which time Applegate's name was removed from such listed authority. Of the $9,800, $5,500 was taken directly from the corporation by defendant and was receipted for by him. In one instance the money was receipted for by his secretary, Jimmie Wilson. The remainder, $4,300, was deposited, at various times, beginning July 28, 1947, to August, 1947, in a "trustee account" of the corporation. In this account was kept money which did not belong to the

corporation. At various times defendant withdrew money from the trust fund for his personal use and for use in the operation of an "Inn" in which he was interested and which later went into receivership. On September 5, 1947, the balance in the trust fund was only $522. No money had been drawn from this account for the purpose of paying any funds over to the association. On September 10, 1947, defendant, through his attorney, incorporated the "United Flower Growers' Association," and the first officers were office employees of defendant's attorney.

As to the organization of the association, it was testified that in the summer of 1947, a conversation was had and an oral agreement was entered into by defendant Applegate, Helen Benson, and Donley, whereby Benson and Donley, in exchange for their services in managing that association, were each to receive 33⅓ per cent of the stock, and the defendant Applegate was to furnish the equipment in addition to $10,000 for capitalization, in exchange for 33⅓ per cent of its stock. This agreement was later modified whereby each original stockholder waived 8 per cent of his stock to one Meek, in exchange for his services as an expert consultant. At a later time each waived 1 per cent to an attorney employed by the association, in exchange for his services. Apparently, no stock was ever issued. After the organization of that association the officers and directors appointed were Donley, president, one Wurman, vice president, Mrs. Benson, secretary-treasurer, and Meek. Applegate was never an officer. Mrs. Benson and Donley resigned from the corporation upon becoming officers and stockholders of the association. Written contracts (in Sept. and Oct.) were executed between the landowners and the association and provided that the net profits from the flower-growing corporation would be split "50-50" between the owners and that association. That association accepted all of the contracts made on its behalf by the promoter, Applegate, and entered into performance thereof. The original contracts, as drawn, proved unsatisfactory to the new attorney for the association and were recalled. During November and December, 1947, new ones were executed, which in effect made the association the employee of the landowners for the purpose of growing flowers for them. The association continued to function. A public accountant was employed to set up the books, and money was expended in furtherance of the contracts for flower growing. Defendant furnished $2,500 worth

of equipment to the association and took back a note, dated October 18, 1947, for one year, covering this amount, "to show his interest in the Association," until such time as the stock would be issued. Defendant never put up the $10,000 they claim he agreed to advance to the association.

After Helen Benson became the secretary-treasurer of the association she made demand on defendant for the balance of $9,800 due that association. Applegate delivered to her nine checks of the corporation totaling $9,800, which were drawn on a Los Angeles bank. When the checks were presented for payment they were returned "N.S.F."

During the next few months the corporation was in bad financial condition, with overdrafts at the several banks. Unpaid wages were due employees and a foreclosure suit was threatened under the main contract for the purchase of the entire tract. In October, the $9,800 in checks were again presented for payment. One check for $400 cleared but the rest were again returned "N.S.F." They were again presented on several occasions with like results and later returned to defendant. At various times thereafter, in response to demands by the association, defendant, between October, 1947, and February, 1948, turned over various sums of money, and in this manner $5,600 of the $9,800 was paid to the association. The balance of $4,200 was never paid over. It consisted of payments made by five named individuals. On June 21, 1948, the information in this action was filed, charging that defendant, on September 15, 1947, misappropriated $9,800. On March 1, 1948, the license of the corporation was suspended by the Real Estate Commissioner. About March 15, 1948, the association was forced to suspend further operations. The crops were not brought to maturity due to lack of funds. Its outstanding liability was $1,603.81.

Defendant Applegate concedes that there was a balance of $4,200 which was received by the corporation under the agreements with the landowners, but claims that he refused to pay this sum over to the association because he believed the officers thereof were squandering the money; that as trustee of those funds he might subject himself to "criticism" or to civil liability if he paid those amounts to the landowners; that since he had a claim against the association in excess of that amount, to wit, $6,000, he was justified in retaining the $4,200.

The main point presented by defendant's brief is the argument advanced in the trial court that the money paid to the corporation for advance capital for flower growing never was

the personal property of the association and that defendant should not have been charged in the information with taking its property; that the corporation, or appellant, if that corporation was his "alter ego," was responsible to the contributors and that by charging embezzlement from the association he had been subject to and is now subject to double jeopardy; that since some of the money was paid to the corporation before the association was "even conceived, much less born," it could not be legally held to be the property of that association which was later formed; and that if there is any embezzlement at all, it is embezzlement of the money taken from and belonging to the property owners, citing *People* v. *Borchers,* 199 Cal. 52 [247 P. 1084], in which it is said that one of the necessary elements of the crime of embezzlement by a bailee is that the accused was *bailee* of the *prosecuting witness* in holding the property, which property must *actually belong to* the alleged principal; that since some of the money was deposited by the owners with the bailee before the existence of the new association, it could not be said that any trust relationship existed between it and the defendant or the corporation.

Defendant offered evidence indicating that he did not remove his equipment from the properties until March, 1948, and at that time it was not in use and had been "scattered all around." Defendant testified in his own behalf and gave a résumé of the volume of sales made by the corporation. He said he was not connected with Clark in the original flower-growing venture although the corporation did expend over $9,000 in experimental work in relation to the feasibility of growing flowers on the land owned by it; that Clark was thrown into receivership, and it made a "very black name" for his corporation because people thought it had "a connection there"; that Donley said he had found the right man (Meek) and he, Meek, and Donley suggested the formation of a flower-growing association and he told them he would help them out financially "to get them started etc."; that around July or August contracts were drawn, and Donley had the purchasers sign them and the money to raise flowers was to be turned over to the association to be formed; that these contracts were considered in violation of the "Blue Sky Law" because of the profit-sharing provision; that new contracts were drawn and signed and the former ones were cancelled; that he was not interested in any stock in the new association but would help it out financially; that he told Donley and Mrs. Benson

that their "stock could control it"; that he objected to their using forms of receipts of the corporation for the money paid for the benefit of the association and they told him "You hold this money and when we get new contracts signed, then turn it back over"; that the corporation took the money under these circumstances only and that he was not "interested in the profits or control" of the association; that the association spent too much money for supervision and he became alarmed; that he gave them a series of checks just to "hold back on the money" because he "didn't know legally who owned that money"; that he sold the association the pipe and equipment that was left over from the Clark receivership for a note of $2,500; that no stock purchase was involved; that his corporation also furnished the association about $4,000 in equipment to develop the property; that when he saw that the association funds were being mishandled he called a conference and told the officers thereof: "I want to serve notice on you that I want nothing further to do with you . . ."; that he demanded that the books of the association recognize the ownership of the equipment and pay him for it; that he told them he would turn over all money collected except $6,500 which the association owed the corporation; that upon the advice of his attorney he paid no more money to the association.

One Carter, a purchaser under one of the contracts, on March 30, 1948, made a written demand on defendant and stated that the association "has not returned the . . . $1500 . . . which was paid to you on September 11, 1947" because "no part of said payment has been turned over to it by you . . . I therefore demand . . . $1500 which I paid to you." Suit to recover this amount was threatened. In this connection defendant argues that this letter proves that the money belonged to the owner, Carter, and not to the association. It should be here noted that the letter was written on the same day the complaint was issued and more than a month after the date of the claimed conversion. It is apparent that the letter, if material, would not establish the fact that the association did not have any legally recognizable ownership therein.

One of the first questions propounded to defendant on cross-examination was whether he had been convicted of a felony in Ohio for defrauding the government and served time in the federal prison. Defendant admitted the conviction and now argues that this fact so highly prejudiced the jury that it found the defendant guilty of an offense which in fact and in law was but a civil controversy as to whom the defendant

owed the money. There was no error shown in the form of the question propounded. The answer was rightfully elicited for impeachment purposes under section 2051-2065, Code of Civil Procedure, and the jury was so instructed. We are unable to state, and it is not our province to determine what effect, if any, it had upon the jury.

The main point here raised, i. e., that the information was defective because the evidence showed that ownership of the money placed in defendant's hands was in the landowners rather than the association, appears to us to be more technical than real. It is true that there is language in *People* v. *Borchers, supra,* which indicates that under a charge of embezzlement it must be shown that the accused was the *agent or bailee* of the complaining witness in holding the alleged embezzled property and that the property must belong to the alleged principal. In that case there was no contention that the defendant was "masquerading under the name of a corporation," and it was distinctly said that the defendant delivered the check to the corporation in accordance with his duty so to do and the court therefore would not inquire what the charge against the defendant would have been if he had failed to comply with his duty and had converted the check to his own use, i. e., whether he should then have been indicted for embezzlement of a paper which was the property of the maker of the check, or of the property which belonged to the corporation. Because all of the evidence showed that the defendant did deliver the check to the corporation according to his duty, the court held there was no embezzlement by the bailee. The facts in the instant case are different. Section 506 of the Penal Code provides:

"Every trustee. . . agent . . . or collector, or person otherwise entrusted with or having in his control property for the use of any other person, who fraudulently appropriates it to any use or purpose not in the due and lawful execution of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, . . . other than for that which he received it, is guilty of embezzlement, . . ."

Section 506a describes who are deemed to be agents under section 506 and a collector is deemed to be an agent and includes every person who collects, or has in his possession or under his control money for the use of another, whether in his name or otherwise, and who fraudulently appropriates it to his own use or the use of any person other than the *true*

*owner,* or *person entitled thereto,* and not in the due and lawful execution of his trust.

It is conceded that the property here involved (the money) was not owned by defendant or his corporation. He did not have title thereto. He merely held it as a trustee as between the owners and the association. The trustee, under the terms of the trust agreement, was obligated to turn the money over to the United Flower Growers' Association, upon its incorporation, and upon the happening of that event, the association was *entitled to it.* Demand was made by the association for it and defendant refused to pay it over for the reasons above mentioned.

The fact that defendant gave the association $9,800 in "N.S.F." checks, the full amount then claimed due, was strong evidence that defendant considered the money as the property of the association. In the absence of some showing to the contrary by the landowners, they were no longer entitled to the money, since the provisions of the trust, so far as this trustee was concerned, were carried out.

In *People* v. *Gallagher,* 100 Cal. 466 [35 P. 80], the court sustained a conviction for embezzlement where the money converted had never been in the possession of the person having legal title. In *People* v. *Treadwell,* 69 Cal. 226 [10 P. 502], it was held that an endorser of a note who turned it over for collection still had an interest in it sufficient to sustain an averment of an ownership on a charge of embezzlement. Then follows the conclusion that "Any legally recognizable interest in property is sufficient for that purpose." In *People* v. *Torp,* 40 Cal.App.2d 187 [104 P.2d 542], money was given by one Austin to defendant Torp, an attorney, to pay over to one Gaine for the purchase of certain property. Defendant delivered to Austin a deed executed by Gaine and appropriated the money received therefor to his own use. The information did not allege whose money it was. Defendant there raised the same point as here indicated and argued that it was necessary to establish legal title to the money which was paid by Austin to Torp. The court there held that the evidence showed that defendant held the money as trustee and appropriated it to his own use and not in the due and lawful execution of his trust; that the title to the property involved need not be absolute, for any "legally recognizable interest" is sufficient; that to establish legal title thereto was unnecessary; that it was sufficient if the money was given to defendant by Austin and was given as a trust fund for a specific purpose; that

"Whether the legal title to the money was in the Austins, the Gaines or Mrs. Costa, is immaterial in this criminal proceeding. As far as the defendant is concerned he had no legal title to the money and his possession was for a limited purpose only. He cannot, in defense of his act, raise the question of title as between others." See, also, *Seavey* v. *State Bar*, 4 Cal. 2d 73 [47 P.2d 281]; *People* v. *Foss*, 7 Cal.2d 669 [62 P.2d 372]. We see nothing in the Borchers case, *supra*, which is in conflict with this line of authorities holding that any "legally recognizable interest" is sufficient to sustain an averment of ownership in and prosecution for embezzlement by a trustee. We must conclude that there was evidence from which the jury might rightfully conclude that the association had such a "legally recognizable interest" in the money as would support such a charge.

■ The next point involves the contention that if sections 506 and 506a of the Penal Code are to be applied, as above indicated, said sections are unconstitutional and in violation of due process, citing *People* v. *Holder*, 53 Cal.App. 45 [199 P. 832]; *In re Blaney*, 30 Cal.2d 643, 656 [184 P.2d 892]; and 16 C.J.S. (Const. Law) §§ 567, 569, 579, 582, p. 1140 et seq. The gist of the argument follows the line of argument advanced under the first point raised and there disposed of, i. e., that the money alleged to have been embezzled from the association would not, by any process of reasoning, have belonged to it, since title thereto had never passed to that association; that defendant, under the charge, is therefore subject to double jeopardy should the landowners later attempt to charge him with embezzlement of these funds in the same amount. These sections, when reduced to their simplest elements, provide that any person intrusted with or having in his control property for the use of any other person, who fraudulently appropriates it to any use or purpose not in the due and lawful execution of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, is guilty of embezzlement. These statutes are set out in clear and understandable language sufficient to enable persons of ordinary intelligence to determine the specific and definite conduct which is forbidden thereby, and do not violate the due process clause of our Constitution. (*Connally* v. *General Construction Co.*, 269 U.S. 385 [46 S.Ct. 126, 70 L.Ed. 322]; *United States* v. *L. Cohen Grocery Co.*, 255 U.S. 81 [41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045].)

While section 506 of the Penal Code has never been under

direct attack as to its constitutionality, the appellate courts have been called upon to directly construe the section and its effect. (*People* v. *Treadwell, supra*; *People* v. *Page*, 116 Cal. 386 [48 P. 326] ; *People* v. *Hatch*, 13 Cal.App. 521 [109 P. 1097] ; *People* v. *Crane*, 34 Cal.App. 599 [168 P. 377] ; *People* v. *Millsap*, 85 Cal.App. 732 [260 P. 378] ; *People* v. *Bullock*, 92 Cal.App. 785 [268 P. 1059].) Convictions under this section have been upheld without intimation that it was unconstitutional. We have come to the same conclusion.

▉ While it is conceded that the "alter ego" as between the corporation and the defendant was properly submitted to the jury, and that there was evidence to support it, it is argued, in this connection, that the same question was applicable as between the association and the defendant and that therefore, one partner cannot be guilty under the law of embezzling money belonging to himself or to the partnership, and that the court erred in refusing his instruction to this effect, citing *People* v. *Brody*, 29 Cal.App.2d 6 [83 P.2d 952]. It is clear from defendant's testimony that he did not intend to and did not in fact actually dominate and control the officers and directors of the association or its affairs to the extent that the separate existence of the corporation should be disregarded and its acts and obligations recognized as those of the defendant. Those officers were demanding that defendant turn over the money retained by him. They were employing the laborers and attempting to carry on the business of flower growing and apparently had severed all connections with the corporation. Under these circumstances it was not error for the trial court to refuse to instruct the jury as requested. (*Wittmann* v. *Whittingham*, 85 Cal.App. 140, 146 [259 P. 63] ; *Garvin* v. *Matthews*, 193 Wash. 152 [74 P.2d 990, 992].)

▉ Defendant next claims that under section 511 of the Penal Code reading: "Upon any indictment for embezzlement, it is a sufficient defense that the property was appropriated openly and avowedly, and under a claim of title preferred in good faith, even though such claim is untenable. But this provision does not excuse the unlawful retention of the property of another to offset or pay demands held against him," he was holding the money under a "claim of right" and it was therefore a "perfect defense" and accordingly he was entitled to a verdict of acquittal. It is not that defendant holds the money under a "claim of right," but he must hold it under a "claim of title in good faith." (*People* v. *Holmes*,

13 Cal.App. 212, 216 [109 P. 489].) As we construe it, defendant was laying claim to the right to hold the money, based upon the proposition that the officers of the association were "squandering the money," or, if it was the association's money, he had an offset against it for the amount of the $2,500 note plus the claimed price of the machinery furnished. The prosecution's testimony showed that the $2,500 note was not supposed to have been paid by the association and that there was no agreement to ever pay defendant for the machinery furnished. ██ Even if, under the evidence, defendant was entitled to the benefit of an instruction under section 511, *supra,* the question whether he was withholding "under a claim of title . . . in good faith" was one of fact for the jury to determine. (*People* v. *Hill,* 2 Cal.App.2d 141 [37 P.2d 849] ; *People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778].) This issue was determined against defendant under an instruction given in the exact language of section 511.

██ The last complaint is that the record does not disclose criminal intent on the part of the defendant, since the evidence shows that defendant turned over nearly three-fourths of the funds collected by him and that there is no evidence of conversion of the balance, at any time. At the insistence of counsel for defendant the entire record, consisting of over 650 pages, which includes his argument and the instructions given and refused, as well as the volume of exhibits received in evidence, have been read. It conclusively shows and defendant admits that he received the funds involved and for the purpose indicated. It likewise is apparent that he did not pay them over to the association nor to the landowners but retained them under the several claims mentioned. The question as to whether this amount was in fact converted to defendant's own personal use was a factual question for the jury. Proper instructions were given on that subject and the jury was told that unless they found that defendant did "actually and personally take and convert" money "belonging to the Association," "with intent to deprive the owner thereof . . . you must find him not guilty." ██ There is evidence that these moneys were placed in "a trust fund" of the corporation; that defendant drew on these funds for his personal use, and on one occasion used some of them for the "Inn" which he was operating or promoting. There is evidence that the bank accounts were overdrawn and that defendant and the corporation were delinquent in payments on

the main contract for the purchase of the acreage, at least four months prior to trial, and that foreclosure proceedings thereon were being instituted. The fact that defendant and his corporation were in bad financial straits is apparent from the record and the jury had the right to believe that defendant did not pay over the $4,800 because that sum had been appropriated to defendant's use, a use which was inconsistent with the trust agreement. Had the jury believed the defendant's story that there was no criminal intent on his part because he was acting under the advice of his attorney in withholding the money, we would not now be confronted with the question presented. Unfortunately, our problem on appeal from the judgment of conviction is a different one. We must determine from the entire evidence, together with the inferences and deductions arising therefrom whether there is sufficient evidence upholding the jury's finding. The evidence, when considered in this light, is sufficient. (*People* v. *Talbot*, 220 Cal. 3 [28 P.2d 1057].)

Judgment and order affirmed.

Barnard, P. J., and Mussell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 5, 1949. Schauer, J., voted for a hearing.