[Crim. No. 4765.   Second Dist., Div. Two.   Apr. 29, 1952.]

THE PEOPLE, Respondent, v. JAMES K. PIERCE et al.,
Appellants.

Daniel Schnabel and Royal M. Galvin for Appellants.

Edmund G. Brown, Attorney General, and Stanford D. Herlick, Deputy Attorney General, for Respondent.

FOX, J.—The defendants Pierce and Morse were convicted, by the court sitting without a jury, on six counts of grand theft and one of conspiracy to commit those crimes. A motion in arrest of judgment and a motion for a new trial were made and denied. Judgment was not pronounced but proceedings were suspended and defendants were placed on probation. They have appealed from the order denying a new trial and have purportedly appealed from the order denying the motion in arrest of judgment, and also from the nonexistent judgment and sentence.

In 1946 one William M. Schultze, Jr., a distributor for a prefabricating company, was in need of a bookkeeper. He contacted Pierce and Morse, who operated a bookkeeping service. A short time later the three men discussed the prefabricated home business and decided to go into the manufacture and sale of such homes. Ultimately a partnership agreement was entered into and they started operations under the name "Pre-Bilt Homes Company." Three or four months later Schultze hired defendant Rhylick as office manager. Some time thereafter it appeared advantagous to form a construction concern to erect the houses and the Great Western and Southern Construction Company was formed and articles of incorporation were filed in which the three defendants, Schultze, and one Smedley were the incorporators. During the operation of these ventures a scarcity of gypsum products, specifically plaster and button board, was encountered. They began a search for gypsum deposits. Properties containing such deposits were located and leases taken thereon. One such lease covered a claim near Taft, California, the lease being executed by the five men. A corporation known as Gypsum, Inc., was formed by these same individuals to mine and process the gypsum. A grinding plant near Rosamond was purchased and attempts were made to convert it to the production of plaster. Smedley assisted as engineer to get the plant into operation but the resulting product was not of a consistent quality and only a small amount of usable material was produced. The gypsum used in this operation was not obtained from any of the leased mining claims but was shipped in from a firm in Nevada. Schultze was principally concerned with Pre-Bilt's lumber supply. Neither he nor Smedley became involved in the financing of the gypsum enterprise.

Defendants Rhylick, Pierce and Morse developed a plan to market that portion of the output which was not needed in the construction of their prefabricated houses. To that end

contracts were entered into with several persons who were to be distributors, each to have his own territory. Each distributor was required to put up a specified amount of cash to be held as "a bond of faithful performance." Gypsum, Inc., failed and went into bankruptcy. The money thus placed with Gypsum, Inc., was neither returned nor repaid. The defendants are charged with the theft of those respective deposits.

The first grand theft count (Count 3) involves the transaction with Charles F. Hoffar, who was a dealer for the Pre-Bilt Homes Company. He was contacted by Pierce in November, 1946, and was told about the shortage of plaster. Pierce explained that defendants were entering this field and offered him a distributorship; he was told that he could obtain all the plaster he wanted up to 5,000 bags a month, but that a bond for faithful performance of the contract would be required. Hoffar thought the premium on such a bond would be about $30. He also talked to Rhylick about the proposal. The next day Pierce called Hoffar in and showed him a form contract and told him that he "would have to put in a $5,000 cash surety instead of a bond." Hoffar was surprised at the cash requirement and replied that $5,000 was a lot of money to put up. He was informed his money was to be put into a bank or reserve and not used; that he was to get it back at any time after giving a 30-day written notice. While he knew he was to be paid four per cent interest, he did not intend to invest the money and he did not know defendants intended to use the money in the business. He was also told his money was to go into a reserve so that if he did not pay for the plaster delivered to him "they could take the money out of my $5,000. . . ." No discussion was had as to where the defendants would deposit the money. Hoffar later delivered his check for $5,000 to Pierce, payable to Gypsum, Inc., in accordance with Pierce's instructions. It was on this occasion that Hoffar signed the standard distributor contract which had been prepared by defendants. It was signed by Pierce on behalf of Gypsum, Inc. It contained, among others, the following provision: "It is further agreed that the party of the second part [the distributor] shall place with the party of the first part [Gypsum, Inc.] $5,000, to be held by said party as a bond of faithful performance; said amount shall draw interest at the rate of four per cent (4%) per annum, and shall be returnable to the party of the second part thirty days after the

expiration of this agreement.'' The contract was to remain in effect until one of the parties gave a 90-day written notice of cancellation, provided, however, the company could cancel it on seven days' notice in the event Hoffar committed certain specific acts. Being unable to get any usable plaster, Hoffar asked Pierce if he could get his money back and was told he could but it was not forthcoming. He then made demand upon each of the defendants for its return but to no avail. Rhylick entered a plea of guilty to this count.

The transaction with Mr. Griffin and Mr. Kuebler of the Palomar Lumber Company is the basis for count four. They were told by Rhylick that it would be necessary to post a deposit as a bond to be held for faithful performance on their part in ordering plaster and button board, and it would be returned according to the terms of the contract. Rhylick further stated ''it would be kept in trust as a deposit.'' The contract, after certain revisions, was signed by Pierce and Rhylick for Gypsum, Inc. The lumber company made the $5,000 deposit. Shortly thereafter Griffin ordered 10 carloads of plaster products but none was delivered. Demand was then made upon the company to refund the deposit of $5,000. The money was never returned.

The Berry deal is the foundation of the fifth count. He was told by Rhylick that if he signed the contract he would get certain quantities of hard wall and button board. It would be necessary, however, for him to put up $5,000 ''to be held as a bond'' to insure performance. He signed the contract and delivered his check for $5,000. Pierce and Rhylick signed for Gypsum, Inc. Berry knew he was to receive four per cent on the money but he was not interested in that feature of the transaction. He wanted to obtain material. From reading the contract it was his understanding that his specific $5,000 would be returned to him. Mrs. Berry questioned the necessity of depositing $5,000 cash as a bond and asked Rhylick ''Why can't we put it in escrow and trust if it is just like a bond, you know, performance bond''? He refused to consider such an arrangement. After receiving 100 sacks of plaster that were unusable Berry demanded the return of his $5,000, or, if the defendants were unable to perform, he was willing to take a quantity of lumber or a house. At this, Pierce became angry, tore off his tie, and declared, ''Give us time, give us time, you are trying to pin something on me.'' Morse told Berry it was impossible to give him any lumber or a house.

The Brunson and Bunch transaction forms the basis of Count 6. This firm was buying and selling building materials with emphasis on plaster, button board and nails. Bunch was told by Rhylick "They required a cash bond to be put up" to guarantee their acceptance of plaster for which the firm would be billed on an open account. The firm's check for $10,000 was delivered and the contract signed on January 8. Deliveries were promised by February 1st, but none was forthcoming. Bunch and his partner took a trip to the plant; they discovered some plaster had been produced but it was not satisfactory because it would not "jell properly." Pierce explained there had been a mixup and they were trying a new process. He then approached Bunch with an offer of an exclusive distributorship of button board in exchange for an investment of $56,000 to complete the work of the plant. As a result another agreement was executed on February 28, 1947. The $56,000 included the $10,000 deposit originally made. The firm of Brunson and Bunch was given security in the form of a promissory note in the sum of $56,000 with an assignment of 40 per cent of the shares of stock in Gypsum, Inc. This agreement provided in part as follows: "That the distributors [Brunson and Bunch] shall loan and pay to Gypsum, Inc., a corporation, or cause to be loaned and paid to Gypsum, Inc., inclusive of the said sum of $10,000 . . . the total sum of $56,000 . . . and Gypsum, Inc., agrees to repay $56,000 on demand . . . with interest at . . . four percent per annum . . ., and upon receipt of said $56,000 Gypsum, Inc., . . . shall make, execute and deliver to said W. B. Brunson and Deon Bunch, copartners, . . . as evidence of said indebtedness, its promissory note for said sum of $56,000 . . ." Bunch later took over the operation of the company for a period of approximately 45 days. The attempt to produce plaster and button board was not successful and the company went into bankruptcy in September, 1947, and operations came to a close.

The Plunkett transaction is Count 7. Pierce and Rhylick told him they had a good proposition to offer him; that a bond would be required. When he was told this bond would have to be in the form of a cash deposit he expressed wonderment as to what it was for and was told the purpose of the bond was to guarantee payment in full for his allotment of materials; the regular form of contract was executed. He was able to raise only $1,000. Arrangements were made through

Rhylick for him to.put up his note for $4,000 in addition to the cash. He received 200 sacks of plaster but it was worthless. When the note matured he was unable to pay it, so he deeded certain real property to Pierce. Thereafter the note was cancelled and Plunkett received an additional two or three hundred dollars. Although he later obtained quitclaim deeds to his property, Plunkett never received repayment of the $1,000.

The transaction with John Hollenbeck is Count 8. He was told that the normal bond would be $5,000 but in his case Schultze would assume a portion of it. Hollenbeck only put up $1,000, although the signed agreement called for $10,000. He did not receive any products called for in the contract. His understanding was that he was to receive the $1,000 back, but repayment was never made. He was later employed as pilot for the company. Thereafter the dealership contract appears to have been abandoned.

Count 1 charges conspiracy to commit grand theft and alleges the receipt and acceptance by the defendants of the various sums of money referred to in the previously delineated transactions. The trial court found each of these alleged overt acts to have been committed by the defendants and found defendants Pierce and Morse guilty of the conspiracy. It was stipulated that the deposits made by the Gypsum distributors were used in the purchase of gypsum leases, the development and operation of the plant, and for salaries, materials and office expenses.

Neither defendant testified.

Defendants contend that the evidence is insufficient to sustain the conviction of grand theft on any of the counts. It is their theory that the transactions with these distributors created only a debtor-creditor relationship in which event defendants could use the funds without being guilty of a conversion. The People, however, contend a trust relationship was established as to these deposits and that their use by the defendants in the Gypsum enterprise violated the trust and constituted embezzlement and therefore grand theft under section 484 of the Penal Code, which provides that "Every person . . . who shall fraudulently appropriate property which has been entrusted to him, . . . is guilty of theft." The position of the People must be sustained.

"Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted." (Pen. Code, § 503.) ■ The crime of embezzlement is included

within the broad terms of Penal Code, section 484. (*People* v. *Mason,* 86 Cal.App.2d 445, 452 [195 P.2d 60]; *People* v. *Myers,* 206 Cal. 480, 483 [275 P. 219]; *People* v. *Robinson,* 107 Cal.App. 211, 221 [290 P. 470].) It is further provided in section 506, Penal Code, that ''Every trustee, . . . or person otherwise entrusted with or having in his control property for the use of any other person, who fraudulently appropriates it to any use or purpose not in the due and lawful execution of his trust, . . . is guilty of embezzlement, . . .''

A trust is either voluntary or involuntary. (Civ. Code, § 2215.) A voluntary trust arises out of the personal confidence reposed in, and voluntarily accepted by, one for the benefit of another. (Civ. Code, § 2216.) Further, a voluntary trust is created by the words and acts of the trustor and trustee, indicating with reasonable certainty the intention of the trustor to create a trust, the intention of the trustee to accept it, and the subject, purpose, and beneficiary of the trust. (Civ. Code, §§ 2221, 2222.) ■ Whether a trust relationship arises from a particular transaction is to be determined from any written agreement plus the acts and declarations of the parties. The determination of the intention is not limited to a construction of the writing. This is particularly true in the criminal field since the prosecution is not bound by any such contract. (*People* v. *Sidwell,* 27 Cal. 2d 121, 126 [162 P.2d 913]; *People* v. *Robinson, supra,* p. 221; *People* v. *Martin,* 102 Cal. 558, 566 [36 P. 952].) ■ It is well settled that no particular language or terminology is needed to create a trust, and that the words ''trust'' or ''trustee'' need not be used. (*Weiner* v. *Mullaney,* 59 Cal. App.2d 620, 631 [140 P.2d 704].) As stated in 25 California Jurisprudence, pages 140-141, section 17, ''Contractual relations are creative of trusts in infinitely varying circumstances . . . a 'trust' exists where property or funds are placed by one person in the custody of another,—e.g., a deposit of money to be retained . . . —or where the legal title of property is conveyed for a limited purpose, as for example, the securing of performance of an obligation by the transferor.'' ■ In order to establish a trust it is necessary to offer clear and convincing proof thereof. ■■ Such proof, however, may be indirect, consisting of acts, conduct, and circumstances, and ''the question whether the showing is clear and convincing is primarily one for the trial court.'' (*Hansen* v. *Bear Film Co.,* 28 Cal.2d 154, 173 [168 P.2d 946].)

■ Applying the foregoing principles it is clear that a trust was established in each of the enumerated transactions. In each instance a contract was signed; it provided that the dealer "shall place with" Gypsum, Inc., a stated amount of money; it also provided that this money was "to be held by said party [Gypsum, Inc.,] as a bond of faithful performance"; it further provided "said amount shall draw interest at the rate of four percent (4%) per annum, and shall be returnable to the party of the second part [the dealer] thirty (30) days after the expiration of this agreement." It will be noted that the money was "to be held" by the company; that it was to be held "as a bond,"—"a bond of faithful performance." It is also to be noted that the dealer agreed to "place with" the company this money and that the amount was "returnable" to him. The agreement does not say the money was a loan, or that it was an investment. The choice of the language used in the contract is significant and revealing. Since the contract was prepared by defendants it should be construed more favorably to the dealers. These written agreements together with the negotiations, both before and at or about the time of their execution, furnish ample evidence of an intention on the part of the dealers that a trust relationship existed and a recognition on the part of defendants of such fact.

It is a reasonable inference that defendants could not have induced the dealers to relinquish the funds without assurance that they would be kept intact. Hoffar, for instance, believed the performance bond would be in the usual form, that is, by the payment of a premium to a bonding company therefor. When he was told that the "$5,000 surety" would have to be in cash he expressed surprise as such requirement. The inference is clear that Hoffar would not have parted with his $5,000 unless he had been given to understand that his money would be held in trust. He testified that he was told his money would be paid into a bank or reserve and not used. He further testified that he did not intend to invest the money, and he did not know that defendants would use the money in their business. When he asked about the return of his $5,000 no explanation was ever made to him that his money had been used; he was repeatedly told that he could get his money back. However, it was never returned because it had been used in the business and was finally lost through the concern's bankruptcy.

In the Palomar Lumber Company transaction the president was told that the money to be put up by the lumber company was a deposit, posted as a bond to be held for faithful performance in ordering plaster and button board, and would be returned according to the terms of the contract. Specifically, defendant Rhylick told Griffin that the money "would be kept in trust as a deposit." No disclosure was made to Griffin that his company's money was to be used in the business.

The Berry transaction again reveals the understanding of the parties and throws further light on defendants' intent. While the negotiations were in progress Berry was told the $5,000 was necessary as surety to insure performance. He believed from reading the agreement that his specific $5,000 would be returned to him. While his understanding from reading the contract may have little significance, still the defendants did nothing to dispel this understanding. During the course of the negotiations an inquiry by Mrs. Berry adds clarity to defendants' intent. She asked why the money couldn't be put into an escrow in trust as a performance bond. Rhylick would not consider such a proposal and represented that the money would be held intact. The purpose of defendants and their consciousness of guilt is further revealed when, in response to Berry's demand for the return of his $5,000 or repayment in materials, defendant Pierce became angry and declared, "Give us time, give us time; you are trying to pin something on me." At this point defendant Morse informed Berry that repayment was impossible in any manner.

The same general type of representations were made both orally and contractually in the Plunkett and Hollenbeck transactions.

Defendants insist that in the Brunson and Bunch transaction there was clearly a loan of $10,000 at the outset because in a later transaction they loaned $46,000 to defendants by an instrument in which the initial $10,000 deposit was stated to be a part of that loan, making the total of $56,000. The subsequent contract is immaterial if there already was a conversion of the deposit held in trust. (*People* v. *Braiker,* 61 Cal.App.2d 406, 412 [143 P.2d 89].) At the beginning of the negotiations Bunch was told that their $10,000 would be used as a bond to guarantee their acceptance of plaster. This representation was incorporated in the contract as in all the other transactions.

Defendants' method of operation, their handling of other deposits, their difficulty in getting their enterprise financed and their urgent need for additional funds, support an inference that the $10,000 had already been converted. However, it appears that Brunson and Bunch were not apprized of this conversion and undoubtedly believed their $10,000 was still being held in trust. If it had been a loan there would be no reason to include it in the later transaction. On April 9, 1949, however, the parties, by a new written agreement, expressed an intention to include the $10,000 as a part of a loan transaction. It is significant that in this subsequent transaction the agreement contained specific language disclosing it was a loan. It was also evidenced by a promissory note, secured by a pledge of 40 per cent of the capital stock of the company.

Defendants place great emphasis on the provision in the dealer-contracts providing that the various amounts placed with the company by the dealers shall draw interest at the rate of four per cent per annum. In the absence of any explanation by the defendants as to its purpose, the interest provision may be considered as an inducement to the various dealers to put up a deposit. They might well have been reluctant to be deprived of the use of their money without some return thereon. ▇ Consequently, the agreement to pay interest may have been considered an important factor in consummating these contracts. It is thus apparent that such a provision does not nullify the creation of a trust in these funds. It is merely one of the facts for consideration in determining the character of these transactions.

Defendants suggest that the provision in the dealer-contracts requiring 90 days' written notice of cancellation and giving the company 30 days thereafter in which to refund deposits indicates a debtor-creditor relationship since a period of 120 days would give the company time to get the funds in hand to reimburse the dealer. Again, in the absence of any explanation by the defendants, a more likely reason for such a period is to enable the company to fill orders that have been placed and adjust the accounts between the parties, and also to enable the company to find another dealer to take the place of the one who was quitting and thus keep their business moving on an even basis. This latter idea finds support in the provision in the contract giving a right of cancellation to the company on seven days' written notice for certain specified acts on the part of a dealer.

It is clear from the evidence and, in fact, stipulated by defendants, that "all deposits" received by Gypsum, Inc., for franchises were expended in the construction and operation of the Gypsum plant, for the purchase of Gypsum leases, and in the usual course of business, such as salaries, materials and general office expenses. The funds were thus applied to a use and for a purpose entirely different from that for which they were received. Because they were trust funds they could not be used for the development and carrying on of the Gypsum enterprise. As trustees defendants had no legal right to make such use of the funds. As a consequence defendants fall squarely within the provision of section 506, Penal Code, which provides that every trustee who fraudulently appropriates property entrusted to him "to any use or purpose not in the due and lawful execution of his trust," is guilty of embezzlement. (*People* v. *Applegate,* 91 Cal.App. 2d 163 [204 P.2d 689]; *People* v. *Fleming,* 220 Cal. 601 [32 P.2d 593]; *People* v. *Fewkes,* 214 Cal. 142 [4 P.2d 538].) The principle here applied is illustrated in *People* v. *Bratton,* 125 Cal.App. 337 [14 P.2d 125]. There "the complaining witness deposited with both defendants money which they were to hold as security for the faithful performance by Ferrari of the duties of his employment. Both defendants admitted they had spent this money in paying hotel bills and on a trip to Los Angeles and that they did not have the money in their possession prior to their arrest. This evidence is amply sufficient to support the verdict and judgment, . . ." (Pp. 341-342.)

The suggestion is made that since the defendants did not personally profit from these funds, they cannot be guilty of grand theft. This proposition is not sound. ▮ Any diversion of funds held in trust constitutes embezzlement whether there is direct personal benefit or not as long as the owner is deprived of his money. (*People* v. *Talbot,* 220 Cal. 3 [28 P.2d 1057]; *People* v. *Braiker,* 61 Cal.App.2d 406 [143 P.2d 89].)

▮ There is ample evidence to support the implied finding that defendants acted fraudulently in diverting these trust funds to the general promotion of their Gypsum venture. They were the persons principally interested in Gypsum, Inc., and were in charge of its management and policies; they were without funds to develop the plant and product and place it on the market; they deliberately used these trust funds

for that purpose; they made it possible for the corporation to use the money these dealers had deposited as a bond for faithful performance, and they did the various acts knowingly and voluntarily. In *People* v. *Jones,* 61 Cal.App.2d 608, 623 [143 P.2d 726], it is said, "The moment he appropriated the funds belonging to his clients to the use of his corporation the crimes of grand theft were committed." So here, the moment the defendants appropriated the funds that had been placed with them by the dealers to the development of the Gypsum enterprise through their corporation they embezzled the funds and were consequently guilty of grand theft. (Pen. Code, § 484.)

The conviction based upon a conspiracy to commit grand theft (Count 1) must also be sustained. Besides a criminal agreement, the prosecution must allege and prove some overt act done in the furtherance of the objects of the conspiracy. (Pen. Code, §§ 182, 184.) ▋ The existence of the agreement may be shown by circumstantial evidence. (*People* v. *Bucchierre,* 57 Cal.App.2d 153, 163 [134 P.2d 505]; *People* v. *Ragone,* 84 Cal.App.2d 476, 480 [191 P.2d 126].) ▋ It is not essential that the overt acts be criminal. (*People* v. *Gordon,* 71 Cal.App.2d 606, 628 [163 P.2d 110].) Nevertheless, if such innocent acts are done as a step toward the furtherance of the conspiracy they are sufficient. (*People* v. *Gilbert,* 26 Cal.App.2d 1, 23 [78 P.2d 770].) ▋ Further, the overt act may be accomplished by only one of the conspirators and yet be sufficient, for the members of the conspiracy are bound by all acts of all members done in furtherance of the agreed plot. (*People* v. *Creeks,* 170 Cal. 368, 374 [149 P. 821]; *People* v. *Benenato,* 77 Cal.App.2d 350, 356 [175 P.2d 296].) ▋ Once the conspiracy is established all evidence of the substantive crimes become admissible against all participants, even though the other conspirators were not present. (*People* v. *Temple,* 15 Cal.App.2d 336, 339 [59 P.2d 417]; *People* v. *Gordon, supra,* p. 627.) ▋ Applying these principles it is clear that the trial court was amply warranted in drawing the inference that all defendants were parties to the agreement and the plan and that each of them wilfully participated in the execution thereof and in each overt act.

▋ Defendants' final point is that Count 1 (the conspiracy count) does not state a public offense. This contention is based on the failure of that count to reallege specifically where each of the overt acts took place. An examination

of the indictment discloses that defendants are accused of entering into a criminal conspiracy to commit grand theft "within three years prior to the finding of this indictment *at and in the County of Los Angeles, State of Calif., . . ."* (Italics added.) The italicized words may well be understood as applying to the whole of Count 1 and not merely to the portion alleging the making of the agreement. This allegation was certainly sufficient to put defendants on notice of the acts with which they were charged. In *People* v. *Gordon, supra,* page 611, it is said "No indictment is insufficient by reason of any defect or imperfection of its form so long as no substantial right of the accused is prejudiced upon the merits of the case, . . ." and "In no event shall a judgment be reversed because of an error in the form of the indictment 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'" (Pen. Code, § 960.) The comment of the court in *People* v. *Goscinsky,* 52 Cal.App. 62 [198 P. 40], is particularly appropriate here. At page 64 the court said: "The point that the information was defective in not stating the county in which the offense was committed may . . . be dismissed with the comment that the evidence showed where it was committed, i. e., where the defendant resided and practiced medicine, and certain it is that the defendant suffered no injury and was not hampered in his defense on account of this omission." In this case defendants could not possibly have been misled or prejudiced because the overt acts alleged in the conspiracy count are based upon the substantive counts charging grand theft in which these acts are all described as having occurred in Los Angeles County, California.

Defendants' purported appeal from the order denying their motion in arrest of judgment is dismissed, as such an order is not appealable. (*People* v. *McGee,* 31 Cal.2d 229, 232 [187 P.2d 706] ; Pen. Code, §§ 1237, 1185.)

The purported appeal from the judgment and sentence must also be dismissed since no judgment or sentence was pronounced. (*People* v. *D'Elia,* 73 Cal.App.2d 764, 766 [167 P.2d 253].)

The order denying the motion for a new trial is affirmed.

Moore, P. J., and McComb, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 29, 1952.